Michael C. Ormsby
United States Attorney
Eastern District of Washington
Stephanie Van Marter
Earl A. Hicks
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>WAYDE LYNN KURT,  )<br>)<br>Defendant.  )<br>) | 10-CR-00114-WFN<br><br>United States' Trial Brief |

Plaintiff, United States of America, by and through Michael C. Ormsby, United States Attorney for the Eastern District of Washington, Stephanie Van Marter, and Earl A. Hicks, Assistant United States Attorneys for the Eastern District of Washington, submit the following Trial Brief.

## I.    BACKGROUND

The Vangard Kindred (VK) was an Odinist, white supremacist gang founded in 2008 by former leader Keegan VanTuyl.  In the Fall of 2008, information was received regarding assaults and other crimes being committed by VK members and their associates.  In January 2009 the FBI initiated an investigation into the VK after receiving several reports of group members and associates engaging in felonious assaults and possible violations of federal statutes.  Subsequent investigation by the FBI confirmed VK leader Keegan VanTuyl and several other members and associates had engaged in a series of

United States' Trial Brief - 1

P10906LC.EHA.wpd

1  felonious assaults and other criminal acts in furtherance of their white supremacist

2  beliefs.  Ultimately, the group was dismantled through pro-active investigation

3  and subsequent prosecution of both VK leader Keegan VanTuyl on federal

4  probation violations and key member Daniel "Church" Wilson on assault charges

5  from the State of Idaho.

6      Wayde Kurt, hereafter referred to as the Defendant or Kurt, was recruited

7  into the VK in December 2008.  VK members routinely traveled around Spokane

8  looking for minorities to bait into a verbal and/or physical altercation, a practice

9  referred to by group members as "coon hunting."  Wilson and several other VK

10 members encountered the Defendant in downtown Spokane, Washington on

11 December 31, 2008.  Wilson exchanged an Odinist greeting with Defendant.  The

12 group then asked the Defendant if there were "any niggers or Jews around."  The

13 Defendant then directed the group to an area where they might find minorities.

14 Wilson subsequently invited the Defendant to one of the VK blots or social

15 functions.  At the time of this encounter, the Confidential Source (hereinafter CS),

16 was already a member of the VK, having been associated with the group since

17 approximately the Summer of 2008.  However the CS was only a member of the

18 VK and did not begin cooperating with the government until 2010.

19     Investigation by the FBI determined that Kurt was actively involved with

20 the VK through approximately April 2009.  In April 2009 there were a series of

21 events which ultimately led to the imprisonment of several keys members of the

22 VK, to include VanTuyl and Wilson.  After they were incarcerated, the Defendant

23 was asked to take over leadership of the VK.  However, the VK began to dissolve

24 and was ultimately disbanded in the summer of 2009.

25     In February 2010, the FBI elicited the cooperation of the CS to obtain

26 information relative to other violent white supremacists residing and/or operating

27 United States' Trial Brief - 2

1   in, Washington State.  The CS cooperated, in part, to avoid being charged with

2   conduct related to a potential federal firearms violation.  On February 15, 2010,

3   the CS was officially admonished and agreed to become a CS for the FBI.  During

4   the course of subsequent debriefings, CS advised he had been contacted by, and

5   subsequently met the Defendant in December of 2009, for lunch.

6          In April 2010 the CS reported on contacts with several former VK members.

7   CS provided both the home and cellular telephone for the Defendant and agreed to

8   contact the Defendant to determine his (Defendant's) status within the white

9   supremacy movement.

10         On May 11, 2010, CS met with the Defendant at the direction of the FBI.

11  During the meeting, the Defendant discussed the Northwest Front (NF), a white

12  supremacist organization whose primary objective is the establishment of a

13  whites-only homeland in the states of Idaho, Oregon, and Washington.  The

14  Defendant also mentioned that he was a good friend of Richard Kemp, a founding

15  member of the white supremacy domestic terrorism group known as The Order.

16         On or about May 29, 2010, CS received a handwritten letter from the

17  Defendant.  In this letter, the Defendant wrote about the NF Constitution, advising

18  the CS of the need to establish a legitimate white government with a monetary

19  system based on a gold or silver standard rather than paper currency.  The

20  Defendant further documented he needed thirty more days to establish a new

21  identity in furtherance of the white supremacy cause, noting the name "Wayde

22  Kurt would only bring a bad reputation to a publically exposed political

23  movement."  This letter was signed "you brother at arms, Wayde Kurt".

24         On June 25, 2010 CS received a handwritten letter from the Defendant

25  requesting a meeting on June 24, 2010.  The requested meeting never occurred

26  because CS received the letter after the proposed meeting date.

27  United States' Trial Brief - 3

P10906LC.EHA.wpd

1    On July 1, 2010, at the direction of the FBI, the CS met with Kurt.  The CS
2 was not fitted with a recording device for this meeting.  During the meeting, the
3 Defendant relayed that he possessed a ".357 snub nose revolver." Additionally, the
4 Defendant stated that he illegally entered into Canada and returned with
5 "contraband;" owned an ultra-light aircraft with a 28 gallon fuel tank; was upset
6 that whites were minorities in some states according to the census; was working
7 on his "task" he had been preparing for years; had 10 P.O. boxes with false names;
8 several credit cards in other peoples names; and a "legitimate looking"
9 Washington State driver's license with someone else's name on it. An additional
10 meeting was scheduled for later in that month.

11    On July 22, 2010, at the direction of the FBI, the CS met with the
12 Defendant.  Prior to the meeting, the CS was fitted with a recording device. During
13 the meeting, the Defendant discussed purchasing a progressive reloader, making
14 teflon baked bullets to penetrate body armor, and owning a "Saiga" firearm.
15 After the meeting, CS received a handwritten letter from the Defendant which read
16 in part, "I just received the parts that I need for reloading the russian (sic)
17 cartridge. Let's meet this coming Thursday August 12 at 4:30 pm at the Friendship
18 park . . .."

19    On August 12, 2010, at approximately 2:26 p.m., the Defendant was
20 captured on video making a purchase at the General Store located at 2424 N.
21 Division Street, Spokane, Washington.  A receipt from the General Store
22 documenting the purchase of one box of 7.62 ammunition on August 12, 2010, at
23 2:26 p.m. was located in the Defendant's wallet which was seized at the time of the
24 Defendant's arrest on August 30, 2010.

25    On August 12, 2010, at the direction of the FBI, CS again met with the
26 Defendant.  The CS was wearing a recording device.  During the meeting, the
27 United States' Trial Brief - 4

P10906LC.EHA.wpd

1  Defendant told the CS that he had manufactured 80 rounds of .38 special, had

2  recently switched to 7.62 x 39 ammunition, having purchased a .38 special in a

3  publication like the penny press, and reiterated that he owned a Saiga rifle.  The

4  Defendant also stated, "I need a good place where I can go out and do some target

5  practicing." The CS then suggested shooting on his property out in Chewelah,

6  WA.

7       The CS and the Defendant discussed target shooting and agreed to shoot

8  firearms on August 21, 2010.  The two agreed to meet on August 21, 2010.  The

9  Defendant subsequently instructed the CS that they would load everything into the

10  truck of Kurt's vehicle on August 21, 2010, but that if they get pulled over "it all

11  belongs to [CS]."  The Defendant stated the reason was because "your legal, I'm

12  not."

13       On August 21, 2010, at the direction of the FBI, the CS met with the

14  Defendant.  The CS was again wearing a recording device.  Prior to the meeting,

15  the FBI had installed a covert video camera at the location where Kurt and the CS

16  agreed to shoot their firearms.  Also prior to the meeting, a JTTF officer in a

17  surveillance plane observed the Defendant carrying unknown items and placing

18  them into the trunk of his car.  The Defendant then left in his car to meet with CS.

19  The plane also observed Kurt meet the CS and watched them proceed to the shoot

20  site in Kurt's car.

21       During the drive north, the Defendant's discussions were recorded on the

22  CS's recording device.  The Defendant stated that he needed to make sure

23  everyone is fed up with Obama.  The CS asked how.  The Defendant responded by

24  saying he would discuss it with the CS after the first of the year.  Kurt stated he

25  was currently putting the finances together. Referring to this plan, the Defendant

26  continued saying he didn't want innocent people to die but it was possible they

27  United States' Trial Brief - 5

P10906LC.EHA.wpd

1   would die.  The Defendant stated that it would be an act of terrorism of the worst

2   kind and would mean a death sentence if he was caught.  He likened his plan to

3   what happened to the Alfred Murrah Building in Oklahoma City.

4       Once the Defendant and the CS arrived at the shoot site they removed the

5   weapons from Kurt's trunk.  CS observed Kurt had brought a Saiga rifle and a

6   snub nose .357 handgun which is consistent with the ammunition Kurt previously

7   discussed producing.  The CS brought three weapons of his own.  During the

8   shoot, Kurt fired all five weapons.

9       At this point in the investigation, it was determined to allow Kurt to take the

10  two firearms he had with him.  This determination was made for two reasons.

11  First, the investigators did not want to jeopardize the safety or identify of the CS.

12  Second, investigators did not want to compromise the ongoing investigations into

13  Kurt's domestic terrorism plot, the use and manufacture of counterfeit currency,

14  and the illegal use and manufacture of false identification.

15      On August 30, 2010, at the direction of the FBI the CS met with the

16  Defendant.  The CS was again wearing a recording device.  Following this meet

17  the Defendant was arrested by the FBI and has remained in custody since the date

18  of his arrest.

19  **II.    Evidentiary Issues:**

20          **A.    Admissibility of Prior Uncharged Acts that are Inextricably
            Intertwined with the Charged Offenses or Alternatively, pursuant
21          to Fed. Rules of Evid.404(b) Evidence**

22      As the Court is aware, while this is a straight forward possession case, it is

23  not the typical felon in possession case.  The reason the Defendant was initially

24  the subject of an FBI investigation, was not just due to his possession of firearms

25  but due to his extensive involvement in groups which advocated violence in the

26  name of moving towards the "final solution."  As a result, throughout the recorded

27  United States' Trial Brief - 6

contact with the CS as well as testimony about the VK, there are a number of areas
discussed which the United States submits are admissible as events which are
inextricably intertwined with the charged offense or in the alternative, would be
admissible pursuant to Fed.R.Evid., Rule 404(b).  Aside from the information
contained in the summary above, the following is a summary list of the areas the
United submits would be admissible:

(1) recorded statements Defendant made to the CS on July 22, 2010,to wit:
making ammo; teflon coating ammo; building or buying a suppressor; test
firing ammo on body armor to determine if the ammo can penetrate body
armor; possessing a Saiga rifle; and preferring tactical silent hits.

(2) recorded statements Defendant made to the confidential source on
August 12, 2010 to wit: Purchasing a .38 special in a publication like the
penny press; making 80 rounds of .38 ammo; desire to blow out traffic
camera; .50 BMG could be used to take down a plane from anywhere;
suggesting target practice at his residence; and loading guns into
Defendant's trunk but that if they get caught that the weapons belong to the
confidential informant because Defendant is not legal.

(3) recorded statements Defendant made to the confidential source on
August 21, 2010 to wit: that Defendant is going to do everything in his
power to stop President Obama from being re-elected; false flag operation ;
possibility of innocent people dying; suicide mission; shooting in low light
and hostage situations; planning something big involving several city blocks
after the winter solstice; and that Defendant brought a "Saiga" and a ".357
snub nose" revolver.

P10906LC.EHA.wpd

(4) recorded statements Defendant made to the confidential source on

August 30, 2010 to wit: recruiting; finances; laws on paramilitary training;

possessing a box full of gun powder; make up artists; and counterfeiting.

(5) Defendant knew the CS through connections with a white supremicist

gang of which all members were on the domestic terrorism watch list.

## 1.    **Inextricably Intertwined**

"Evidence of 'other acts' is not subject to Rule 404(b) analysis if it is

'inextricably intertwined' with the charged offense." *United States v. Beckman*,

298 F.3d 788, 793–94 (9th Cir.2002) (citing *United States v. Vizcarra–Martinez*,

66 F.3d 1006, 1012 (9th Cir.1995). This exception may be triggered in one of two

ways.  First, it applies when other-acts "evidence ... constitutes a part of the

transaction that serves as the basis for the criminal charge." *Vizcarra–Martinez*, 66

F.3d at 1012. Where the alleged evidence is "inextricably intertwined" with the

charged offense, the court may admit the evidence without regard to Rule 404(b).

*United States v. DeGeorge,* 380 F.3d 1203, 1220 (9th Cir.2004) (citing

Vizcarra-Martinez, 66 F.3d at 1012). Thus, in *United States v. Williams*, 989 F.2d

1061, 1070 (9th Cir.1993), the Ninth Circuit "concluded contemporaneous sales of

cocaine and crank by the defendant were inextricably intertwined with the crime

with which the defendant was charged: the sale of cocaine." *Vizcarra–Martinez*,

66 F.3d at 1012. As noted in *Williams*, "[t]he policies underlying rule 404(b) are

inapplicable when offenses committed as part of a 'single criminal episode'

become other acts simply because the defendant 'is indicted for less than all of his

actions.' " *Id.* (quoting *Williams*, 989 F.2d at 1070 (*quoting United States v.

Soliman*, 813 F.2d 277, 278 (9th Cir.1987))).

> Second, the exception applies when "other act" evidence is necessary:
> to permit the prosecutor to offer a coherent and comprehensible story
> regarding the commission of the crime; it is obviously necessary in
> certain cases for the government to explain either the circumstances

United States' Trial Brief - 8

under which particular evidence was obtained or the events surrounding the commission of the crime. This exception to Rule 404(b) is most often invoked in cases in which the defendant is charged with being a felon in possession of a firearm.

*Vizcarra–Martinez*, 66 F.3d at 1012–13.

In these cases, other-acts evidence is not character evidence, but " 'direct evidence,' used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in its proper context." *United States v. Ramirez–Jiminez*, 967 F.2d 1321, 1327 (9th Cir.1992). "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Daly*, 974 F.2d 1215, 1217(9th Cir.1992), *quoting United States v. Moore*, 735 F.2d 289, 292 (8th Cir.1984). In *United States v. Beckman,* 298 F.3d 788, 794 (9th Cir.2002), a defendant was charged with importing over 1,500 pounds of marijuana. His defense was that he was tricked into transporting the marijuana by the chief government cooperating witness. This witness testified at length about prior drug runs that Beckman had made on his behalf. The Ninth Circuit found that the witness's testimony was "inextricably intertwined" with the charged offense, because it was "intended to establish the witness's relationship to Beckman and to show that the relationship was ongoing. See also, *United States v. Curtin*, 443 F.3d 1084, 1089-1091  9th Cir. 2006); *United States v. Serang*, 156 F.3d 910, 915-916 (9th Cir. 1998)  *cert. denied, Serang v. United States*, 525 U.S. 1059, 119 S.Ct. 627(U.S. 1998); *See also United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir. 1992) (holding that "evidence concerning other acts that are inextricably intertwined with the charged acts may be admitted" to *"put [defendant's] illegal conduct into context and to rebut his [defense]"*) (emphasis added).

United States' Trial Brief - 9

1    Here, both prongs are satisfied. The Defendant's statements which discuss

2    firearms are directly intertwined to his knowingly possessing firearms. Morever,

3    Defendant's statements regarding the reasons he possessed firearms to include a

4    planned suicide mission involving several city blocks are intertwined with his

5    illegal possession of firearms.  It is intertwined because it directly explains the

6    circumstances under which particular evidence was obtained.

7        Similarly, Defendant's membership in an organization of which its members

8    were placed on the domestic terrorism watch list explains the how the evidence

9    was obtained.  Defendant likely would not have been the target of an investigation

10   but for his membership in an organization which advocated the violent overthrow

11   of the United States government. Thus, the fact that Defendant was on the terrorist

12   watch list, had a "plan" in the works, and was putting together resources to

13   accomplish his plan, is all intertwined.  These facts explain a coherent and

14   comprehensible story regarding Defendant's illegal possession of firearms.

15       Additionally, the United States anticipates Defendant will try to justify his

16   criminal conduct by claiming he was entrapped. To rebut an entrapment defense, it

17   is appropriate to offer evidence that, before or after the charged offense, the

18   defendant was involved with firearms or ammunition. *United States v. Segovia*,

19   576 F.2d 251, 252 (9th Cir. 1978) (discussing drug possession).  The United States

20   should be allowed to explain the circumstances surrounding how and why the

21   Defendant knew the CS and why there was an agreement to meet for target

22   practice.  Those circumstances are intertwined with the Defendant's involvement

23   with these groups and his plans for terrorist activities, all of which allow the

24   United States to rebut his entrapment defense.  Moreover, the absence of such

25   evidence will hinder the United States ability to tell a coherent story of the facts

26   leading to Defendant's charged conduct and rebut any entrapment defense. It will

27   United States' Trial Brief - 10

1  particularly hinder the United States ability to show that Defendant was

2  "predisposed" to commit the charged offense.

3      Therefore, the United States should be allowed to present the above stated

4  evidence as inextricably intertwined to Defendant's commission of the crime.

5      **2.    Otherwise Admissible Pursuant to Fed. R. Evid., Rule 404(b)**

6      Even if the Court were to apply a Federal Rules of Evidence, Rule 404(b)

7  analysis, the testimony is likewise admissible.  Federal Rule of Evidence 404(b)

8  provides:

9      > Evidence of other crimes, wrongs, or acts is not admissible to prove
       the character of a person in order to show action in conformity
10     > therewith.  It may, however, be admissible for other purposes, such as
       proof of motive, opportunity, intent, preparation, plan, knowledge,
11     > identity, or absence of mistake, or accident, provided that upon
       request by the accused, the prosecution in a criminal case shall
12     > provide reasonable notice in advance of trial.

13      The Ninth Circuit employs a four-part test to determine admissibility of

14  prior "bad act" evidence:

15     > To be probative of something other than criminal propensity, the prior
       bad act evidence must: (1) prove a material element of the crime
16     > currently charged; (2) show similarity between the past and charged
       conduct; (3) be based upon sufficient evidence; and (4) not be too
17     > remote in time.

18  *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997).  *See also United*

19  *States v. Arambula-Ruiz*, 987 F.2d 599, 602 (9th Cir. 1993).  Additionally, the

20  probative value of the evidence must be examined under the balancing test of Fed.

21  R. Evid. 403.  *Arambula-Ruiz*, 987 F.2d at 602.

22      "Evidence of a defendant's prior act is admissible under Rule 404(b) if that

23  'evidence is probative of a material issue in the case.'" *United States v. Jones*, 982

24  F.2d 380, 382 (9th Cir. 1993) (quoting *United States v. Ramirez-Jiminez*, 967 F.2d

25  1321, 1325 (9th Cir. 1992)).  The United States may introduce evidence of prior

26

27  United States' Trial Brief - 11

1  acts provided that such acts "tend[] to make the existence of [the Defendant's]

2  knowledge or intent more probable than it would be without the evidence."  Id.

3     **a.** **Material Element**

4     Testimony of the Defendant's membership in this organization and his

5  statements as to the reasons he was manufacturing his own ammunition and

6  possessing firearms, are relevant to a material element of the charged offense

7  because it tends to show knowledge and intent.  Knowledge is a material element

8  of the crime of felon in possession of firearms.  *United States v. Beasley*, 346 F.3d

9  930, 934 (9th Cir. 2003), *cert. denied*, 542 U.S. 921 (2004).  This evidence will go

10  to negate any claim that the Defendant was "entrapped" or was not predisposed to

11  his possession and use of these firearms.  Therefore, the evidence will go to show

12  knowledge and intent, and will not be admitted merely to show criminal

13  disposition.

14     **b.** **Similarity**

15  > When offered to prove knowledge, however, the prior act need not be
16  > similar to the charged act as long as the prior act was one which
   > would tend to make the existence of the defendant's knowledge more
   > probable than it would be without the evidence.

17  *United States v. Arambula-Ruiz*, 987 F.2d 599, 603 (9th Cir. 1993) (*quoting*

18  *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1326 (9th Cir. 1992).  There is a

19  obvious factual similarity between the Defendant's earlier possession of firearms

20  and his manufacture of ammunition and his possession and use of these same

21  firearms on the day in question. Additionally, the Defendant's intentions as to

22  these firearms as a part of his membership in these groups, is a necessary

23  foundation to the similar charge of felon in possession of firearms.

24

25

26

27  United States' Trial Brief - 12

P10906LC.EHA.wpd

1

        c.    **Sufficient Proof**

2        This prior bad act testimony is supported by sufficient evidence.  "[S]imilar

3  act evidence is relevant only if the jury can reasonably conclude that the act

4  occurred and that the Defendant was the actor."  *Huddleston v. United States*, 485

5  U.S. 681, 689 (1988).  "This reliability threshold is not a high one, and the

6  testimony of a single witness can be sufficient."  *Johnson*, 132 F.3d at 1283 (citing

7  *United States v. Hinton*, 31 F.3d 817, 823 (9th Cir. 1994)).  Here, this evidence is

8  based upon recorded statements and video of the Defendant.  Thus, this evidence

9  more than satisfies the low threshold required by this part of the test.

10        d.    **Remoteness**

11        The prior acts to be admitted occurred during the same time period as the

12  charged offense. The court has held that even remote acts may be admissible if

13  they are extremely probative and relevant.  *See United State v. Johnson*, 132 F.3d

14  1279, 1283 (9th Cir. 1997) (prior act evidence from thirteen or more years ago was

15  sufficiently similar to the charged conduct to render it probative despite the

16  passage of time) (quoting *United States v. Spillone*, 879 F.2d 514, 519 (9th Cir.

17  1989).  Thus, it is clear in this case that prior acts which occurred within the same

18  time period, within several months of the charge at issue, are not too remote.

19        e.    **Probative Value/Prejudicial Effect**

20        "Relevant evidence means evidence having any tendency to make the

21  existence of any fact that is of consequence to the determination of the action more

22  probable or less probable than it would be without the evidence."  Fed. R. Evid.

23  401.  Moreover, the probative value of the other acts evidence must also outweigh

24  its prejudicial effect.  See, Fed. R. Evid. 403.

25        The district court engages in the requisite balancing of probative value of

26  prior conviction with its prejudicial value when the judge gives an appropriate

27  United States' Trial Brief - 13

instruction limiting the purpose for which the jury could consider evidence of the defendant's prior conviction.  *See United States v. Arambula-Ruiz*, 987 F.2d 599, 604 (9th Cir. 1993); *United States v. Rubio-Villareal*, 927 F.2d 1495, 1503 (holding probative value or prior drug conviction outweighed any prejudice because of high need for evidence coupled with judge's careful limiting instruction weighed in favor of admission).

This evidence is relevant because it makes it more probable that the Defendant possessed the described firearms.  The Defendant's basis for his illegal conduct is his beliefs and involvement in groups which espouse violence.  The Defendants statements, intention and knowledge are so intertwined with this offense there is no legitimate way to separate the evidence.  More importantly, this evidence becomes even more probative in consideration of the Defendant's theory of entrapment.  Lastly, any prejudicial effect can be minimized with a limited instruction by the trial court.  This limiting instruction will tip the scales in favor of the evidence being more probative than prejudicial.

**B.**    **Tape recordings and transcripts**

As the Court is aware, there are a number of tape recorded conversations with transcripts that the parties have been working on in order to try and come up with an agreement as to what should be admitted.  At this time, the United States does not believe there is a dispute and believes the admissibility of the evidence will be agreed upon.  However, should there become an issue, the United States submits the following.

The authentication of the tapes and transcripts is a factual issue to be decided by the Court, not the jury. Fed. .R. Evid. 104(a), 901(a).  Or in other words, conflicting evidence on genuineness goes to the weight, not the

United States' Trial Brief - 14

P10906LC.EHA.wpd

admissibility, so long as some reasonable person could believe the item is what it is claimed to be. *United States v. Johnson*, 637 F.2d 1224, 1247 (9th Cir. 1980). Federal Evidence Rule 901(a) provides:

> (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

To satisfy Rule 901, the government must show that the proffered tapes are true, accurate, and authentic recordings of the conversations between the parties. *United States v. Panaro*, 266 F.3d 939, 951 (9th Cir. 2001); *see also United States v. Mouton*, 617 F.2d 1379, 1383-84 (9th Cir. 1980) ( For a recording to meet the authenticity requirement, a trial court, in the exercise of its discretion, must be satisfied that the recording is "accurate, authentic, and generally trustworthy.").

Generally, as long as recordings are authentic and reliable, the decision to admit them into evidence rests in the sound discretion of the trial court. *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). The trial judge exercises great latitude when deciding if recordings and transcripts of those recordings are admissible.

Likewise, the preferable means of authenticating transcripts of taped conversations is stipulation between the parties or a pretrial determination by the court. The use of transcripts during trial, even in situations where the actual recordings are not played for the jury, is reviewed for abuse of discretion. *United States v. Pena-Espinoza*, 47 F.3d 356, 359 (9th Cir. 1995). The foundation for authentication of the transcripts will consist of the testimony of FBI Special Agent Joseph Cleary. The transcripts in this case were originally prepared by S/A Ryan

United States' Trial Brief - 15

Butler and S/A Cleary.[1] Rather than attempt to identify and subpoena the particular preparer of each transcript, both the CS and Agent Cleary have listened to each recording and reviewed the transcription. Thus, both the CS and Agent Cleary will testify that they have reviewed the transcripts "word-for-word," have listened to the tapes, and have found that the transcripts are accurate. *See, e.g., United States v. Rengifo*, 789 F.2d 975, 983 (1st Cir. 1985).

DATED September 6, 2011.

Michael C. Ormsby
United States Attorney


s/ Earl A. Hicks

Earl A. Hicks
Assistant United States Attorney

---

[1]The records were transcribed as follows: July 22, 2009, recording by S/A Butler; August 12 recording by S/A Butler and S/A Cleary; August 22, 2010 recording by S/A Butler; August 21, 2010, recording by S/A Butler; August 30, 2010, recording by S/A Butler.

United States' Trial Brief - 16

1         I hereby certify that on September 6, 2011, I electronically filed the

2    foregoing with the Clerk of the Court using the CM/ECF System which will send

3    notification of such filing to the following, and/or I hereby certify that I have

4    mailed by United States Postal Service the document to the following non-

5    CM/ECF participant(s):

6

7         Richard D. Wall
     Attorney at Law
8    221 West Main Avenue, Suite 200
     Spokane, WA 99201
9

10                     s/ Earl A. Hicks

11                     Earl A. Hicks
     Assistant United States Attorney
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   United States' Trial Brief - 17