1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )      No. 10-CR-114-WFN
                                   )      October 19, 2011
vs.                                )      Spokane, Washington
                                   )
WAYDE LYNN KURT,                   )      Transcript of:
                                   )      Testimony of
          Defendant.               )      Anthony Johnson and
_____  )      Melonie Howells

BEFORE THE HONORABLE WM. FREMMING NIELSEN
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Earl A. Hicks
                            Stephanie A. Van Marter
                            Assistant United States Attorneys
                            P.O. Box 1494
                            Spokane, WA  99210-1494

For the Defendant:          Richard D. Wall, Attorney at Law
                            221 West Main, Suite 200
                            Spokane, WA  99201

Official Court Reporter:    Debra Kinney Clark, RPR, CSR
                            United States District Courthouse
                            P.O. Box 700
                            Spokane, WA 99210
                            (509) 458-3433

Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.

1                          WITNESS INDEX

2  ON BEHALF OF THE DEFENDANT:        DR      CR    RE-DR    RE-CR

3       ANTHONY JOHNSON                3      35      43       45

4       MELONIE HOWELLS               47      53      --       --

1          (October 19, 2011)

2               MR. WALL:  The defense will call Anthony Johnson.

3               THE COURT:  Mr. Johnson, come forward, if you would,

4     please.  Step forward here and face me and raise your right hand

5     to be sworn, if you would, please.

6               THE WITNESS:  Here?

7               THE COURT:  Yeah.  That's fine.

8     (WITNESS, ANTHONY JOHNSON, called as a witness on behalf of the

9     defendant, having first been duly sworn, testified as follows:)

10               THE COURT:  Please be seated.

11               MS. VAN MARTER:  Your Honor, the United States is

12     going to object to the relevancy of any testimony by Mr. Johnson

13     and would ask to voir dire in aid of objection.

14               THE COURT:  Let's let Mr. Wall get started first.  I

15     think your objection is a little premature.  I certainly don't

16     know what he's going to say.

17               MS. VAN MARTER:  Well, I think there was some

18     indication earlier; but we'll go ahead and let him answer a few

19     questions, Your Honor.

20               THE COURT:  All right.

21                         DIRECT EXAMINATION

22     BY MR. WALL:

23     Q    Mr. Johnson, could you please state your name and spell it

24     for the record?

25     A    Anthony Johnson.  A-n-t-h-o-n-y J-o-h-n-s-o-n.

1   Q    Okay.  And have you sometimes gone by other names?

2   A    Anton, A-n-t-o-n.

3   Q    Okay.  And where do you currently reside?

4   A    Spokane, Washington.

5   Q    And how long have you lived in Spokane?

6   A    Better part of 25, 27 years.

7   Q    Okay.  And how old are you now?

8   A    28.

9   Q    Okay.  So you've lived here most of your life, then?

10  A    Long enough to call it home.

11  Q    Okay.  And have you lived in Spokane continuously for that

12  period of time?

13  A    No.

14  Q    Okay.  Were there periods of time when you lived outside of

15  Spokane, then?

16  A    Lived in Coeur d'Alene and parts of Montana on and off.

17  Q    Okay.  And were those for extended periods of time or short

18  periods of time?

19  A    Montana was a short period of time.  Idaho was maybe about

20  a year, year and a half.

21  Q    Okay.  And what's the extent of your education?

22  A    High school.

23  Q    And did you get a -- did you graduate from high school?

24  A    I did.

25  Q    Okay.  And were you -- during -- prior to graduating from

1  high school, were you residing with a family member?  Or where

2  were you residing?

3  A    I moved out of my mom's house around age 14, 15.  Lived

4  with a girlfriend from there, and then lived on the streets for

5  a while until I was about 20.

6  Q    Okay.  And during that time, that's when you graduated from

7  school?

8  A    I graduated from school when I was with my girlfriend at

9  the time.

10  Q    Okay.  Did you at some point become interested in white

11  supremacist type of beliefs?

12  A    I guess, per se, when you're living on the street, it's

13  kind of like being in jail.  You look for somebody to look out

14  for you when you're sleeping and, when you're not around,

15  wherever you're sleeping.  And those happen to be the type of

16  people that come to you.  And you just hang out, you listen to

17  what they have to say, and go from there, and just be glad

18  you've got somebody to watch out for you.

19  Q    Okay.  And did you ever come into contact with a person by

20  the name of Keegan VanTuyl?

21  A    I did.

22  Q    And how did you come into contact with Mr. VanTuyl?

23  A    I was downtown when his friends approached me and said they

24  knew about a party out in the valley.  And we took the last bus

25  out there.  And it happened to be at his house, where the party

1  persisted for about a week and half.

2  Q    Okay.  And do you remember approximately when this was?

3  Approximately, the year?

4  A    2000, 2001.

5  Q    Okay.  And who was the person that introduced you to

6  Mr. VanTuyl?

7  A    I don't think it was an actual introduction to him.  It was

8  just down the grapevine of there's a party at this place.  And

9  enough people catch it.  And finally, you end up on the train

10  and go.

11  Q    Okay.  And at that time, when you met Mr. VanTuyl, did you

12  adhere to what would be considered racist beliefs?

13  A    Did I adhere to them?

14  Q    Yes.

15  A    Not in any extremity.

16  Q    Okay.  Did you have -- after meeting Mr. VanTuyl, did he

17  indicate to you that he was involved in any kind of groups based

18  upon white supremacy or white racism?

19  A    Not at that time.

20  Q    Okay.  Did he at some later time?

21  A    At some later time, yes, after already doing time in jail.

22  Q    Okay.  And when did that happen; that is, when did you next

23  have contact with him?

24  A    That would have been a few years down the road.  I don't

25  know the exact time line.

1  Q    Okay.  And what happened when you contacted Mr. VanTuyl

2  again?

3             MS. VAN MARTER:  Your Honor, I'm going to object.  And

4  may I at this time voir dire in aid of an objection in terms of

5  relevance?

6             THE COURT:  Okay.  You may.

7             MS. VAN MARTER:  Good afternoon, Mr. Johnson.

8             THE WITNESS:  Afternoon.

9             MS. VAN MARTER:  Have we ever met before?

10            THE WITNESS:  I don't believe so.

11            MS. VAN MARTER:  What year are you talking about?

12            THE WITNESS:  At what?  When --

13            MS. VAN MARTER:  That you met Mr. VanTuyl.

14            THE WITNESS:  When I first met him was between 2000

15  and 2001.

16            MS. VAN MARTER:  And then the second time you met him,

17  what year?

18            THE WITNESS:  Probably around 2003, 2004.  I don't

19  have an exact recollection of when I ran into him.  It was right

20  after he had gotten out of federal prison, though.

21            MS. VAN MARTER:  And you ran into -- I want to ask you

22  specifically about 2010.  Between April of 2010 and August of

23  2010 --

24            THE WITNESS:  Okay.

25            MS. VAN MARTER:  -- did you have any contact with

1    Mr. VanTuyl?

2              THE WITNESS:  I did.

3              MS. VAN MARTER:  Between -- in 2010?

4              THE WITNESS:  No.  Not in 2010.

5              MS. VAN MARTER:  Okay.  And in 2010, between April of

6    2010 and -- well, let me ask you this.  You know Mr. Kurt.

7    Correct?  Did you have any contact with Mr. Kurt between April

8    of 2010 and August of 2010?

9              THE WITNESS:  No.

10             MS. VAN MARTER:  In fact, had you not had any contact

11   with Mr. Kurt since a year or so before that?  Is that correct?

12             THE WITNESS:  There was gateways of communication but

13   none needed, apparently.

14             MS. VAN MARTER:  Yeah.  But more than -- more than a

15   year had passed?

16             THE WITNESS:  Which I would take as there was no

17   imminent threat that I needed to be alerted to.

18             MS. VAN MARTER:  So were you not in fear for your

19   life, is that correct, during this time period?

20             THE WITNESS:  That's wrong.

21             MS. VAN MARTER:  You were not in communication with

22   Mr. Kurt.  Is that correct?

23             THE WITNESS:  Didn't need to be.

24             MS. VAN MARTER:  And you were not in communication

25   with Mr. Kurt during 2010.  Correct?

1          THE WITNESS:  He would have contacted me if I needed

2  to know.

3          MS. VAN MARTER:  You were not in communication with

4  Mr. Kurt.  Correct?

5          THE WITNESS:  No.

6          MS. VAN MARTER:  Your Honor, I'm going to object to

7  the relevancy of any testimony by Mr. Johnson at this point in

8  time.  There has been no establishment of any communication

9  during the relevant period of time of the case or any of the

10 relevant things that the jury is here to consider.

11         THE COURT:  I'm going to reserve on the objection

12 because I think we have to hear some more.  I'm not sure where

13 this is going to go.  It may not be relevant.

14 Q    (By Mr. Wall)  Okay.  We were, I think, talking about you

15 reconnecting with Mr. VanTuyl.

16 A    Yes.

17 Q    Okay.  At that time, did Mr. VanTuyl indicate that he

18 was -- had become an adherent to racist-type beliefs?

19 A    Very much.

20 Q    Okay.  And at some point, did he invite you to become part

21 of a group that he was involved in?

22 A    Yes.

23 Q    And do you recall when that was?

24 A    Not an exact date.

25 Q    Okay.  Was it immediately or was it sometime later?

1  A    When we -- when -- immediate following our reconnection was

2  the same day of this is what I'm a part of.  I'd like to invite

3  you into it and you can be a part of it, reflecting on our

4  previous knowing of each other.

5  Q    Okay.  And did you join any particular group at that time?

6  A    I didn't join anything.  I -- I hung around to see what was

7  going on.  I was interested in the religious aspect that he was

8  involved in.

9  Q    Okay.  And what religious aspect are you --

10  A    Asatru, or also known as Odinism.

11  Q    Okay.  And is that one of the things that Mr. VanTuyl

12  introduced you to?

13  A    He said he was the gothi, which is their term for priest of

14  the group.  And so I was hoping to learn from him about that,

15  just as curiosity out of the religion.

16  Q    Okay.  Was that something different from white

17  supremacist --

18  A    It was a separate group; yes.  But he was involved in both.

19  Q    Okay.

20          THE COURT REPORTER:  I'm sorry.  Would you answer

21  again?  It was a --

22          THE WITNESS:  It was -- it was -- they were two

23  separate groups, but he was involved in both.

24  Q    (By Mr. Wall)  Okay.  At some point, did you become aware

25  of a group called the Vanguard Kindred?

1  A     Yes.

2  Q     And do you recall when that was?

3  A     This was all pretty much a part of the first day of

4  conversation.

5  Q     So all the way back to 2004?

6  A     No.

7  Q     Oh.

8  A     Of us reconnecting this last time.  It was -- he was a part

9  of the kindred, the gothi, the white supremacy.  That was -- we

10 talked for quite a -- quite some time.

11 Q     Okay.  Can you put a time frame on when that conversation

12 occurred?

13 A     Probably about six months prior to my assault.

14 Q     Okay.  Well, if you could sort of tell us what year or

15 what -- approximately what year and month that would have been.

16 A     I'd have to say '07, '08.

17 Q     Okay.

18 A     I don't -- I don't remember the exact year.  It's -- after

19 what I've been through, it's something I try not to pay

20 attention to.

21 Q     Okay.  And did you become a member of that group or any

22 other group at that time or sometime after that?

23 A     I became heavily affiliated as far as attending the kindred

24 stuff, which is the religious aspect of it.

25 Q     Okay.  Did you become familiar with a group called the

1  Valhalla Bound Skinheads?

2  A    I was aware of them.

3  Q    Okay.  And did you have an understanding of who was part of

4  that group?

5  A    I did.

6  Q    Okay.  And who did you understand were a part of that

7  group?

8  A    Keegan would have been the head of it.  Then there was a

9  guy by the name of Church.  Ben.  Carma.  Dave.  Wayde was

10 around, but I never actually got he was a part of it or not.  He

11 was just always there, in the back.

12 Q    Okay.  And in connection with these, you said you became

13 heavily involved with attending meetings.

14 A    Yeah.  I did.

15 Q    What was the nature of those meetings?

16 A    Getting together in the woods, remembrance of the gods, and

17 talking over literature about Odinism.

18 Q    Okay.  So was it your understanding that the primary focus

19 of those meetings was religion?

20 A    Yes.

21 Q    And were those meetings attended by Mr. Kurt?

22 A    Yes.

23 Q    And at the time you were -- became involved in this group,

24 did you have a girlfriend?

25 A    I did.

1  Q    Okay.  And did she get introduced to any of the members of

2  this group?

3  A    She did once.

4  Q    Okay.

5  A    Maybe twice.

6  Q    And did you receive anything as part of being involved in

7  this Vanguard Kindred?  Did you receive any sort of symbols or

8  emblems?

9  A    I was given a Thor's hammer necklace, pendant.

10 Q    Okay.  And do you recall approximately when you received

11 that?

12 A    No.

13 Q    All right.  Was there a point during any of these meetings

14 at which the issue of your girlfriend being partly Jewish came

15 up?

16        MS. VAN MARTER:  Objection, Your Honor.  Leading.

17        THE COURT:  It is leading.  Sustained.

18        MR. WALL:  Okay.

19 Q    (By Mr. Wall)  As part of these meetings with the Vanguard

20 Kindred, they involve -- do they involve the same people as you

21 mentioned were members of the Valhalla Bound Skinheads?

22 A    Several members were involved in both.

23 Q    Okay.  And who generally was sort of -- was leading these

24 meetings?

25 A    The kindred ones in the woods?

1  Q    The -- any of the meetings of the Vanguard Kindred.

2  A    Keegan.

3  Q    Okay.  You mean Mr. VanTuyl?

4  A    Yeah.

5  Q    Okay.  And just -- can you give us a general description of

6  Mr. VanTuyl?

7  A    Approximately six foot, 250 pounds.  So very well built.

8  Covered in tattoos.  Very intimidating.

9  Q    Okay.  Did he appear to be, from your observations, a

10 violent person?

11 A    Again, very intimidating on the -- I found later, when I

12 was being assaulted, that he was violent.

13 Q    Okay.  But I guess -- when you say "intimidating," do you

14 mean physically intimidating?

15 A    Yeah.  It's like looking down at the Incredible Hulk.

16 Q    And do you recall if the issue of the Jewish religion ever

17 came up with regard to your girlfriend at the time?

18 A    During one of the classes, when we were going over books

19 when Melonie was present, she pulled me aside and made mention

20 that she shouldn't probably come to these things.  I asked her

21 why.  She said, "Because I'm part Jewish."  And after that, when

22 I took her home, I talked to Keegan.  And because we had been

23 friends in the past, I figured I could confide in him.  And he

24 said, "Yeah.  You shouldn't bring her around.  And don't mention

25 it to anybody else in the group.  It could have negative

1 consequences."

2 Q    Okay.  Do you remember attending a meeting that took place

3 toward the end of March of 2009?

4 A    If that's the assault you're referring to, yes.

5 Q    Well, I'll ask it a different way.  Do you recall attending

6 a meeting at which you were assaulted?

7 A    Very much.

8 Q    Okay.  And can you give us some idea about how long you had

9 been actively involved in this group prior to that meeting?

10 A    Four to six months.

11 Q    Okay.  And how long had you known Mr. Kurt prior to that

12 particular night?

13 A    Same time period.

14 Q    Okay.  And what was the purpose of this particular meeting,

15 as you recall?

16 A    I was asked by Ben to pick him up and take him there, that

17 they wanted to talk to him.  He told me -- or -- asked me to

18 watch his back and watch for anything suspicious because he felt

19 that he might be getting jumped there.  So we got there; and I

20 sat outside of everybody else and was watching him, waiting to

21 see if anything got suspicious.  And that's when I was

22 assaulted.

23 Q    Okay.  Now, was this a meeting -- or -- did you anticipate

24 that this was a meeting like other meetings of the same group?

25 A    Just to get together as everybody was supposed to be there

1    to have beer, talk, hang out.  It was just --

2    Q    All right.  So this was not like an official Odinist or

3    Asatru meeting?

4    A    No.

5    Q    Okay.  And you spoke a little bit about those types of

6    meetings earlier.  In those meetings, were there certain rituals

7    that were performed or that you went through?

8    A    Yes.

9    Q    Okay.  And did those things involve racist type of

10   activities or speech?

11   A    Not directly.

12   Q    Okay.  And was Mr. Kurt at some of these meetings or many

13   of these meetings?

14   A    At the ones for Asatru?  Yes.

15   Q    Okay.  And at these meetings, did Mr. Kurt ever express

16   racist beliefs or tendencies?

17   A    None that I'm aware of.

18   Q    Did other people at these meetings express those types of

19   beliefs or tendencies?

20   A    Not during the ritual or ceremony; no.

21   Q    Did they during the meetings?  I mean -- not during the

22   ceremonies but at other times?

23   A    It wasn't the main focus.  It was just side conversation.

24   Q    Okay.  Did they express those type of beliefs to you

25   outside the context of those meetings?

1   A      Yeah.

2   Q      Often?

3   A      Frequently.  It was -- I don't know.  It felt like

4   recruitment.

5   Q      Okay.  And were you aware of a concept, prior to this

6   meeting that we were talking about where you were assaulted, of

7   spilling blood for one's race?

8   A      I had heard of it before.

9   Q      Okay.  And where did you hear of it?

10  A      On the street.  Everything from when I was living on the

11  street to TV shows to -- Church and Keegan had made mentions of

12  it a couple times.  It had gotten broughten (verbatim) up via

13  the ranking by colors of your shoelaces.

14  Q      Okay.  And what was the significance of the color of

15  shoelaces?

16  A      Indicated what you had or had not done.

17  Q      Okay.  And when you went to this one particular meeting,

18  were you wearing a particular color of shoelaces?

19  A      Yes.  I was wearing red shoelaces.

20  Q      Okay.  And was that subject brought up at this particular

21  meeting?

22  A      Just moments before the assault.

23  Q      Okay.  What about the subject of your girlfriend's

24  religion?  Was that brought up?

25  A      During the assault.

1  Q    Okay.  So can you describe for us at this meeting how

2  this -- first of all, who was present at this particular

3  meeting, as you recall?

4  A    Myself, Kurt, VanTuyl, Church, Ben, Dave, and Carma.

5  Sorry.  I don't know everybody by last name.

6  Q    Okay.  And --

7  A    Church's wife as well.  And I believe her name was Jody

8  (phonetic).  A blonde female that owned the place.

9  Q    Okay.  And were you all in one room?  Or what was the

10 general activity that was going on?

11 A    We were all in the living room.

12 Q    And what was the general activity that was going on?

13 A    Most everybody was just sitting down, drinking beer, except

14 for Church, which was pacing the length of the living room,

15 listening to music on the TV.

16 Q    Okay.  And -- and you say you were assaulted.  Did

17 something happen during that meeting that precipitated that

18 assault?

19 A    I'm not sure if any one thing set it off as much as it was

20 planned.  Church went to the DVD player, changed the song.  He

21 said, "I love this song," and quickly approached me and

22 proceeded to kick me in the head, removing me from the seat that

23 I was in.

24 Q    Okay.  And what happened after that?

25 A    I fell to the ground.  He continued to kick me in the face

1   and the head.  And probably a minute or two into it,

2   Keegan VanTuyl and Ben both joined in in kicking the crap out of

3   me.

4   Q    Okay.  Did you attempt to defend yourself at all during

5   this assault?

6   A    Defend by covering my face and curling into a ball.  Yes.

7   Q    Okay.  Did you attempt to strike back at all?

8   A    No, I did not.

9   Q    And why not?

10  A    When you're getting kicked in the head that much, that

11  fast, you just try to block what's coming at you.

12  Q    Okay.  And did the assault go beyond kicking and punching

13  at some point?

14  A    It did.  There was a couple times of:  That's enough.  Let

15  him -- let him up.

16  Q    Let me ask you:  Who was saying that, or who said that?

17  A    It was Wayde who was asking them to stop and let me go.

18  And it did stop after a few minutes of him pleading with them to

19  let me go, at which point when I went to sit up, just before I

20  sat up, I heard him say -- heard somebody say:  You better get

21  up.  They're going to stab you.  And I sat up and --

22          MS. VAN MARTER:  Your Honor, I'm going to object to

23  hearsay at this point.  And can I voir dire in aid of an

24  objection of relevance again at this point?

25          THE COURT:  Well, I'm going to overrule the objection

1    of hearsay.  It explains that he stood up.  He was told to stand

2    up by somebody; and he stood up, as I understand the question.

3                MS. VAN MARTER:  And we -- at this time, we're

4    renewing our objection for relevancy as well.

5                THE COURT:  Well, I understand your objection; and I'm

6    reserving on it.

7    Q    (By Mr. Wall)  Okay.  So I think we were at the point where

8    somebody said you better get up.

9    A    Yeah.  Somebody said, "You better get up."  And so I went

10   to sit up.  And Ben had handed Church a swastika knife.  I was

11   familiar with it.  I had seen him with it many times before.  He

12   grabs -- grabbed for my feet and proceeded to cut my boots off

13   from the bottom of the laces upwards to the top of the boot, and

14   which I still bear marks on both my feet from where I was

15   stabbed with the knife.

16   Q    Okay.  And who was this that used the knife to cut the

17   boots?

18   A    Church.

19   Q    Church?

20   A    Yes.

21   Q    Okay.  And were you conscious throughout this -- the

22   assault up to this time?

23   A    I was in and out of conscious (verbatim).

24   Q    Okay.  And what happened after Church had cut the laces of

25   your boots?

1  A    He was laughing, telling me to get out of there.  And as I

2  stood up, he ripped the Thor's hammer off my necklace and asked

3  for my wallet.  When he seen that it had no money in it, he gave

4  it back to me; and I was allowed to walk out of the door at that

5  point.

6  Q    Okay.  And what happened after you walked out of the door?

7  A    I ran to my vehicle, and I left.  And it immediately

8  followed with a phone call from Keegan, asking me to come back,

9  that there was no harm in it, that it was just a check to see if

10  I'd stand up for myself, and that I was still in good company if

11  I came back.

12  Q    Okay.  And did anybody say anything about whether or not

13  you should report this to the police or anything?

14  A    From the moment the assault stopped, it was -- it was said

15  by multiple people that I should not contact the police or tell

16  them that anything happened.  If I did, then worse would happen.

17  Q    And you say "multiple people."  Could you identify who was

18  saying that?

19  A    Church said it.  Keegan said it on the phone.  And Ben said

20  it just as I was getting into my vehicle.

21  Q    Okay.  Did you go back?

22  A    No.

23  Q    Why not?

24  A    Because I'm not stupid.  I was in fear of my life.  They

25  had already done that to me.  During the assault, Keegan was

1   talking about cutting me up in the bathtub.

2   Q    Okay.  Did you actually hear Mr. VanTuyl talk about cutting

3   you up in the bathroom?

4   A    A couple times during my in and out of consciousness.

5   Q    And what happened after you got to your vehicle?

6   A    Well, Keegan had called.  I ended up hanging up on him to

7   contact another friend of mine to meet with me so I could get to

8   the hospital.  After I had arranged that with him, then I

9   continued back to my girlfriend's house.

10  Q    Okay.  And when you say he called you, did you have a

11  cellular phone at the time?

12  A    I did.

13  Q    All right.  And did you arrive at your girlfriend's house?

14  A    I did.

15  Q    Okay.  And what happened after you got there?

16  A    After I got there, she was hysterical.  My friend showed

17  up.  Her neighbor came over and got the keys to my truck and

18  went and headed down the street and another friend's garage, and

19  I was taken to the hospital there.

20  Q    Okay.  And did you get treatment at the hospital?

21  A    I did.

22  Q    Okay.  And what -- do you recall what kind of treatment you

23  got?

24       MS. VAN MARTER:  Your Honor, again, I'm going to renew

25  my objection for relevance.

1          THE COURT:  I'm going to -- we've gone beyond what's

2    relevant, I think, Mr. Wall.

3          MR. WALL:  Okay.  I'll continue and see where we go

4    from here.

5       Your Honor, I do have an exhibit that I'd like to show

6    just --

7          MS. VAN MARTER:  Your Honor, we'll be objecting to the

8    exhibits.  We know what those exhibits are.  Again, it's not

9    relevant.

10          THE COURT:  Well, let's see if it can be identified.

11          MS. VAN MARTER:  To the witness only?

12          MR. WALL:  Oh.  I'm sorry.  To the witness only.

13   Q    (By Mr. Wall)  This is actually -- first of all, I'll just

14   ask you about the first page of this exhibit.  Is that something

15   that you recognize?

16   A    Yeah.

17   Q    And that's -- this -- this is a series.  Do you recognize

18   that?

19   A    I do.

20   Q    And that as well?

21   A    Yup.

22   Q    And are those accurate depictions of -- of -- of you on the

23   date that we're talking about?

24   A    Those are pictures that I took after -- following --

25   after -- following the hospital.

1          MS. VAN MARTER:  Your Honor, again, we object to the

2    relevance of these.

3          MR. WALL:  Could we approach, Your Honor?

4          THE COURT:  No.  I'm going to sustain the objection.

5    We've heard lots of testimony in the government's case in this

6    case about the assault.  It's not necessary to show photographs

7    of the victim.  Sustained.

8          MR. WALL:  I would like to make a record on that, if I

9    could, Your Honor.

10         THE COURT:  Well, you can have the exhibits marked.

11         MR. WALL:  It is marked, Your Honor.

12         THE COURT:  What?

13         MR. WALL:  It's been marked as Exhibit 106.

14         THE COURT:  Okay.

15   Q    (By Mr. Wall)  After this assault, right after you went to

16   the hospital and got treatment, did you have any contact with

17   members of the Vanguard Kindred?

18   A    Wayde called me two, three days after the assault.  The

19   first thing that he said to me was, "I'm not calling you as your

20   friend."

21         MS. VAN MARTER:  Objection, Your Honor.  Hearsay.

22         THE COURT:  Sustained.

23   Q    (By Mr. Wall)  Okay.  Without telling us what Mr. Kurt

24   said --

25   A    Okay.

1  Q      -- can you tell us what happened?

2  A      As far as the -- Wayde contacted me.  We talked about what

3  happened.  Probably about a week and a half, two weeks after

4  that, a contact was made from Carma and Dave and Ben that they

5  wanted me to come over for a barbecue, that they were apologetic

6  to what had happened.

7  Q      And did you go to a barbecue?

8  A      I didn't.  I went over there very cautiously to see what

9  was going on.

10 Q      Do you know if Mr. Kurt attended that barbecue?

11 A      He was not there.  Not that I remember.

12 Q      Okay.  And what happened at that barbecue?

13 A      Sat around.  Talked about what happened.  They apologized

14 that it happened.  Told me they didn't know it was going to

15 happen.  We had food.  Drank a couple beers.  I left.  It only

16 took place over a couple hours.

17 Q      Okay.  Did you have any more contact with Mr. Kurt?

18 A      Wayde and I maintained contact after that.  Periodically,

19 every couple days, he'd let me know what he had heard from

20 everybody else because I was in the process of making myself

21 very scarce and leaving town.

22 Q      Okay.  When you say you were in the process of making

23 yourself very scarce, can you explain that?

24 A      Not going out in public, watching where I went based off of

25 what Wayde had told me about where my assailants were and their

1   whereabouts.

2   Q    Okay.  And was there a particular reason why you were being

3   careful in that regard?

4   A    The people that I thought were my friends had just

5   assaulted me and -- and, well, as the hospital put it, almost

6   killed me.

7   Q    At that point, did you have --

8            MS. VAN MARTER:  Objection.  Again, move to strike any

9   reference to statements provided to this witness by the

10  hospital.

11           THE COURT:  Sustained.

12  Q     (By Mr. Wall)  Did you have a fear of Mr. VanTuyl at that

13  point?

14  A    Yes.

15  Q    Okay.  What about the person you knew as Church?

16  A    Very much.

17  Q    What about the person you knew as Ben?

18  A    Somewhat.

19  Q    How about Mr. Udseth?

20  A    No.

21  Q    Okay.  What about Mr. Kurt?

22  A    No.

23  Q    Did you and Mr. Kurt ever meet in person again after --

24  A    Yes, we did.

25  Q    -- a couple days?

1      When -- about how -- about when was that?

2  A    Our first meeting after the assault was a few days right

3  after -- afterwards.  And then we met quite frequently after

4  that.

5  Q    Okay.  Did you ever meet at the Big R?

6  A    Yes, we did.

7  Q    And why did you meet at the Big R?

8  A    He had felt bad -- what happened.  And my boots were taken.

9  And so he felt bound with guilt, honor -- whichever -- that he

10 was going to buy me new boots.

11 Q    And did he buy you new boots?

12 A    He did.  I'm wearing them now.

13 Q    Did you ever have contact again with Mr. -- or -- with the

14 person known as Church?

15 A    No, I did not.

16 Q    Did you have contact with anyone associated with him?

17 A    Not that I'm aware of.

18 Q    Did you ever have contact from his girlfriend or wife?

19 A    From his wife.  She tried to call me.  She called me a few

20 times.  I refused to answer.  Then one call, I ended up

21 answering without looking at the caller ID.  It was her.  She

22 asked me to come by so we could --

23         MS. VAN MARTER:  Objection, Your Honor.  Again,

24 hearsay.

25         THE COURT:  Sustained.

1  Q     (By Mr. Wall)  Did -- did -- first of all, what was her

2  name?  Do you remember her name?

3  A     I think it was April.

4  Q     Okay.

5  A     I'm not sure.  I didn't hear her name much.  She wasn't

6  involved in -- Church didn't allow her to be involved in a lot.

7  Q     Did she ask to meet with you?

8  A     She did.

9  Q     And did you agree to meet with her?

10 A     I did.

11 Q     Okay.  And can you describe -- first of all, did you make

12 any preparations for that meeting?

13 A     I did.  I contacted Wayde and asked him if he would meet

14 with me and sit down the block and keep an eye out and make sure

15 that if anything happened, there would at least be somebody

16 there to call the police.

17 Q     And why would you ask Mr. Kurt to do that?

18 A     Because we were on a basis in which I trusted him.

19 Q     Okay.  Were you concerned for your safety in going to meet

20 April?

21 A     I was.

22         MS. VAN MARTER:  Your Honor, may I ask one question in

23 aid of voir dire -- or -- voir dire in aid of an objection?

24         THE COURT:  Yes, you may.

25         MS. VAN MARTER:  Two questions.

1      When did this occur, sir, this meeting?

2             THE WITNESS:  I don't have an exact date.  I didn't

3    keep a calendar.

4             MS. VAN MARTER:  A year?

5             THE WITNESS:  Well, the meeting with Church's wife

6    after the assault?

7             MS. VAN MARTER:  Uh-huh.

8             THE WITNESS:  It would have been within a month.

9             MS. VAN MARTER:  So 2009 sometime?

10            THE WITNESS:  Yeah.

11            MS. VAN MARTER:  And was Mr. Dave Udseth involved at

12   all in this meeting?

13            THE WITNESS:  No.

14            MS. VAN MARTER:  Was Mr. Dave Udseth ever present in

15   any meeting between you and Mr. Kurt?

16            THE WITNESS:  No.

17            MS. VAN MARTER:  Again, Your Honor, we renew our

18   objection for relevancy.

19            THE COURT:  I don't think that meeting is relevant.

20   Contacts with Mr. Kurt -- there's no objection to that.

21   Q    (By Mr. Wall)  Mr. Johnson, you testified that you had

22   contacts with Mr. Kurt following this assault.  Correct?

23   A    Yes.

24   Q    Okay.  Did you have a particular purpose in having contact

25   with Mr. Kurt?

1   A    He was the only way that I could keep eyes and ears on the

2   people who had assaulted me.  So that way I could still move

3   about without having to worry about it.  He was pretty much like

4   a guardian, watching my back.  He let me know this is what they

5   want to do, this is where they're at.  So I stayed safe.

6   Q    And did you let him know that you were concerned about

7   these people?

8   A    I did.

9   Q    Okay.  And did he indicate to you how he was keeping tabs

10  on them?

11  A    Not in depth.

12  Q    Okay.  Did you -- were you aware that he was meeting with

13  David Udseth?

14          MS. VAN MARTER:  Objection, Your Honor.  Leading.

15          THE COURT:  It is leading.  Try not to lead.

16          MR. WALL:  Okay.

17  Q    (By Mr. Wall)  Did Mr. Udseth's name come up at all in

18  these kind of conversations?

19  A    Periodically.

20  Q    Okay.  And were you concerned at all for the safety of your

21  girlfriend?

22  A    Absolutely.

23  Q    And why?

24  A    Part of the reason I was assaulted was because she was

25  Jewish.

1  Q    Okay.  Did you have a fear that she might also be assaulted

2  at some point?

3  A    Absolutely.

4  Q    Was that -- would that be something that would be

5  consistent with the beliefs of the people who were involved in

6  the Valhalla Bound Skinheads?

7  A    Yes.

8  Q    Okay.  Did -- were you ever contacted by the police in

9  regards to this assault?

10  A    I was.  Twice.

11  Q    Okay.  And did they ask you to tell -- explain what

12  happened?

13  A    They did.  On the first meeting, the first contact with

14  them, they'd asked me to testify, that their boss didn't believe

15  the story.

16          MS. VAN MARTER:  Objection, Your Honor.  Hearsay.

17          THE COURT:  It is.

18          MR. WALL:  I'll try to -- try to ask it a little

19  differently.

20  Q    (By Mr. Wall)  Immediately following the assault, were you

21  contacted by police?

22  A    I wouldn't say immediately.

23  Q    Okay.  Within a few days?

24  A    No.

25  Q    Okay.  When was the first time you were contacted by the

1  police after the assault?

2  A    I was pretty well healed up.  So it would have had to have

3  been at least a month after.

4  Q    Okay.  And did they ask you to identify the people who had

5  assaulted you?

6  A    They did.  They approached me with more information than I

7  had given anybody else.

8  Q    Okay.  So when they contacted you, they made it clear that

9  they were aware the assault had happened?

10  A    They did.

11  Q    Okay.  And did you tell them who had assaulted you?

12  A    I did not.

13  Q    Okay.  Did you give them some kind of a story of how you

14  had been injured?

15  A    When I went to the hospital and -- to explain what had

16  happened, yes, I had made a false story at that time out of fear

17  of retribution from the -- from the guys that had assaulted me.

18  Q    And did -- when you were later contacted by police, did you

19  retract that and tell them what actually happened?

20  A    I told them the same story that was given at the hospital,

21  and they -- they gave me the actual account of what happened,

22  with the actual names.

23  Q    Okay.  So at that time, they indicated they knew who was

24  present at the assault?

25  A    They did.

1  Q     Did that make you feel safe in telling them the truth of
2  what happened?
3  A     No.
4  Q     And why not?
5  A     It just added to the paranoia that the skinheads there were
6  better off connected than I had previously thought.
7  Q     And what do you mean by "better off connected"?
8  A     They had to figure things out somehow and -- I don't know.
9  It felt like a trap.  I was extremely paranoid after the
10 assault.
11 Q     Okay.  And for how long did you continue to have contact
12 with Mr. Kurt following this assault?
13 A     Eight months to a year.
14 Q     Okay.  And did you continue to consult with him about the
15 activities of the Valhalla Bound Skinheads?
16 A     I did.
17 Q     And did he provide information to you?
18 A     He let me know whether they were in Spokane, in
19 Coeur d'Alene, if they were actively looking for me, if I had
20 been brought up in conversation.
21 Q     Did you at any time ask Mr. Kurt to provide a weapon to
22 you?
23 A     At our second or third meeting after the assault -- he had
24 said during our first conversation after the assault that he was
25 going to --

1           MS. VAN MARTER:  Your Honor, I'm going to object to

2    this whole line of questioning.  It's going to solicit hearsay.

3           THE COURT:  It is hearsay.

4           MR. WALL:  I'll ask him to try to answer without

5    telling us what Mr. Kurt said.

6    Q    (By Mr. Wall)  Did you -- did you at some point ask him to

7    provide you with a weapon?

8    A    I did.

9    Q    And what was the purpose of that request?

10   A    Retaliation.

11   Q    Okay.  And did he agree to provide you with a weapon?

12          MS. VAN MARTER:  Objection, Your Honor, as to hearsay

13   in the answer -- or -- in the question.

14          THE COURT:  Just ask him if he did provide a weapon.

15   Q    (By Mr. Wall)  Did he provide you a weapon?

16   A    He did not.  He refused.

17          MS. VAN MARTER:  Objection, Your Honor.  Again, move

18   to strike.  He made a reference to statements.

19          THE COURT:  It is -- strike that answer.

20   Q    (By Mr. Wall)  Did you ask him for a specific type of

21   weapon?

22   A    I asked him for a gun.  He refused.

23          MS. VAN MARTER:  Objection, Your Honor.  Again, move

24   to strike.

25          THE COURT:  Sustained.  Strike.

1              THE WITNESS:  How am I supposed to answer this?

2              THE COURT:  Just --

3              MR. WALL:  Well, I'd like clarification of what is

4    stricken.  I assume the part where he said he asked for a gun is

5    not stricken.

6              THE COURT:  He asked for a gun.  And the next question

7    was did he provide one, and the answer was no.  That's not

8    stricken.

9    Q    (By Mr. Wall)  Do you recall ever meeting with Mr. Kurt at

10   the -- Lance Pounder's construction --

11   A    Several times.

12   Q    Okay.  Do you recall when that was?

13   A    Just part of our meetings, get-together.  I'd be in the

14   neighborhood.  I'd swing by because I knew he was there after

15   work, still working.

16   Q    And did these meetings also involve you seeking information

17   about the activities of the Valhalla Bound Skinheads?

18   A    It would be fair to say all of our meetings were on the

19   grounds of informing me of what they were doing.

20             MR. WALL:  That's all I have.  Thank you.

21             THE COURT:  Ms. Van Marter, cross?

22             MS. VAN MARTER:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MS. VAN MARTER:

25   Q    Mr. Johnson, you testified that you were not in fear of

1   Mr. Udseth.  Is that correct?

2   A    Yes.

3   Q    And, in fact, you provided that information to FBI when

4   they contacted you, that you had never been in fear of

5   Mr. Udseth.  Correct?

6   A    At which meeting with the FBI was this?

7   Q    Well, you had more than one.  Correct?

8   A    I had two contacts after the assault, and I refused to

9   acknowledge even knowing these guys.

10  Q    In fact, you provided a number of false statements to the

11  FBI during those contacts.  Isn't that correct?

12  A    At that point, yes.

13  Q    And you refused to cooperate with the FBI.  Correct?

14  A    Yes.

15  Q    You refused to provide any information to allow them to

16  investigate your assault.  Correct?

17  A    Yes.

18  Q    And, in fact, you -- of those -- I think there was a total

19  of three law enforcement contacts.  You were contacted by a

20  Spokane police officer at the hospital.  Correct?

21  A    Yup.

22  Q    And you provided a false statement to that officer.

23  Correct?

24  A    Yup.

25  Q    You were contacted in July of 2009 by an FBI agent for the

1  first time.  Correct?

2  A    He presented himself as law enforcement, not directly as

3  FBI.  But yeah.

4  Q    And it seems appropriate that was July of 2009?

5  A    Sounds about right.

6  Q    And you refused to cooperate with law enforcement at that

7  time.  Correct?

8  A    Yes.

9  Q    You were contacted again in August of 2009, and you refused

10  to cooperate that second time.  Correct?

11  A    Yeah.

12  Q    So fair to say that the FBI was contacting you to try and

13  obtain information to assist in the investigation of your

14  assault.  Correct?

15  A    Yes.

16  Q    When I first got up and talked to you, you told the jury

17  that you had not had contact with Mr. Kurt for approximately a

18  year leading up to April, March -- or -- April, May, June, July

19  of 2010.  Is that correct?

20  A    My time line is not perfect.  I don't have -- I -- I don't

21  remember dates.

22  Q    But there was a long period of time that passed where you

23  had not had any contact with Mr. Kurt.  Correct?

24  A    Well --

25  Q    Is that fair to say?

1  A    Definition of long, but yeah.  As our meetings went on,

2  they got further and further in between because my name kept --

3  Q    I'm not asking that, sir.  I said:  When you first

4  testified, you --

5            MR. WALL:  Your Honor, that's responsive to the

6  question.  I'd ask that she allow him to respond.

7            MS. VAN MARTER:  Okay.

8            THE COURT:  Just -- start over again.  Just listen

9  carefully, Mr. Johnson.  Just answer the questions that are

10  asked of you.

11  Q    (By Ms. Van Marter)  When you first testified, when I first

12  came up and asked you a question, I asked you if approximately a

13  year had passed between the April to July 2010 time frame that

14  you had actually spoken to Mr. Kurt.  Correct?

15  A    Yeah.

16  Q    And a long period of time had actually passed during that

17  time period between April and July of 2010 from the last time

18  you spoke to Mr. Kurt.  Correct?

19  A    Yeah.

20  Q    And you've had no contact with Mr. Udseth.  Correct?

21  A    No.

22  Q    And you have no idea about the contact -- any recorded

23  contact or video contact -- between Mr. Udseth and Mr. Kurt.

24  Correct?

25  A    When I was hanging out with --

1  Q    No.  Between Mr. Udseth and Mr. Kurt.

2  A    Well, it's kind of relevant.  When we -- when I was hanging

3  out with the kindred, there were several times that people had

4  been approached by the FBI with pictures and photographs.  So is

5  that what you're referencing, or are you --

6  Q    No.  I'll rephrase the question.

7       In 2010, between April of 2010 and July of 2010 --

8  A    Then the answer is no.

9  Q    -- you had no contact with Mr. Kurt.  Correct?

10 A    No.

11 Q    No contact with Mr. Udseth.  Correct?

12 A    No.

13 Q    You had no idea what Mr. Udseth and Mr. Kurt were doing

14 during that time period?

15 A    No.

16 Q    You have no idea if they were talking to each other?

17 A    No.

18 Q    In fact, you have no idea if, a year prior to that, they

19 were talking to each other.  You hadn't had any contact.

20 Correct?

21 A    I couldn't honestly tell you the last time that we did have

22 contact.

23 Q    Okay.  And so back in -- this contact with Mr. Kurt that

24 you testified to was after your assault in 2009.  Correct?

25 A    Yes.

1  Q    And I think we have a police report, just so that we're all

2  clear on the date.  And the police report inter -- the police

3  interviewed you at the hospital.  Right?

4  A    Yes.

5  Q    What date is notated there?

6  A    3-31-2009.

7  Q    Okay.  So if the police contacted you at the hospital on

8  March 31st, 2009, that would have been around the time of the

9  assault.  Correct?

10  A    That would have been the night of the assault.

11  Q    And you went to a barbecue at Mr. Udseth's house

12  approximately two weeks after that assault.  Correct?

13  A    Two, three weeks.

14  Q    So we're into April of 2009?

15  A    Yeah.

16  Q    Okay.  And then you spoke to Mr. Kurt on and off right

17  after the assault period.  Correct?  And were you aware that

18  Mr. VanTuyl was incarcerated after the assault?

19  A    No, I was not.

20  Q    Were you aware that Church was incarcerated after the

21  assault?

22  A    About a week after, when I had contact with his wife; and

23  she said that he was --

24  Q    I'm not asking you for what she said.  Were you aware if

25  Mr. Church was incarcerated after the assault?

1  A    I was.

2  Q    So you -- so you did not know Mr. VanTuyl was incarcerated?

3  Is that what your testimony is?

4  A    Yes.  I did not know he was in jail.

5  Q    Yet, according to your testimony, you were talking to

6  Mr. Kurt about where Mr. VanTuyl was.  Is that correct?

7  A    To where they all were.

8  Q    Okay.  But you weren't concerned about Mr. Udseth?

9  A    No.

10 Q    And you weren't even concerned about the other individual

11 who participated in the assault.  What was his name?  There was

12 VanTuyl.  Correct?

13 A    Yeah.

14 Q    Church?

15 A    Yeah.

16 Q    And who was the third person?

17 A    Ben.

18 Q    And those three people were the ones engaged in your

19 assault.  Correct?

20 A    Yes.

21 Q    And those were the ones that you were afraid of.  Correct?

22 A    Yes.

23 Q    And the way that you met Mr. Kurt was through the Vanguard

24 Kindred.  Correct?

25 A    Yes.

1          MS. VAN MARTER:  Just one moment, Your Honor.

2      (Pause in proceedings.)

3          MS. VAN MARTER:  Your Honor, I hate to be a broken

4   record; but at this time, the United States is renewing its

5   objection as to the entirety of Mr. Johnson's testimony.

6   There's no connection whatsoever to the events of this case.

7   There's no connection to Mr. Udseth whatsoever.  There's no

8   indication they had any recent communication or that there

9   was -- any threats of recency were communicated.

10         THE COURT:  I want to clarify something.  Mr. Johnson,

11  I made a note from your testimony.  Tell me if I'm wrong -- that

12  after the assault, you were in regular contact with Mr. Kurt;

13  and I wrote down eight months to a year after your assault.  Is

14  that what you said?

15         THE WITNESS:  I believe so.

16         THE COURT:  Is that what you said?

17         THE WITNESS:  That -- that is what I said.  And

18  that's --

19         THE COURT:  Is that the period of time that Mr. Kurt

20  was keeping you advised as to the whereabouts or the activities

21  of these other people?

22         THE WITNESS:  Yes.

23         THE COURT:  All right.  And then I think you testified

24  that in -- starting sometime in 2010 or after that period of

25  time expired that I just asked you about and through 2010, you

1    had no contact, basically, with Mr. Kurt or Mr. Udseth.

2                 THE WITNESS:  Yeah.  I believe that would be correct.

3                 THE COURT:  Is that correct?

4                 THE WITNESS:  I believe so.

5                 THE COURT:  Do you have any questions, Mr. Wall?

6                 MR. WALL:  Excuse me?

7                 THE COURT:  Any more questions of Mr. Johnson?

8                 MR. WALL:  I do have some questions.

9                 THE COURT:  What?

10                MR. WALL:  Yes.

11                THE COURT:  You're through with your

12   cross-examination, Ms. Van Marter?

13                MS. VAN MARTER:  Yes, Your Honor.

14                THE COURT:  On redirect.

15                MR. WALL:  Thank you, Your Honor.

16                          REDIRECT EXAMINATION

17   BY MR. WALL:

18   Q    Mr. Johnson, Ms. Van Marter was asking you about your

19   refusal to cooperate with law enforcement immediately following

20   this assault?

21   A    Yes.

22   Q    Yes.  Are you cooperating with law enforcement now?

23   A    I am.

24                MS. VAN MARTER:  Objection, Your Honor.  Outside the

25   scope.

1          THE COURT:  It is.  I don't remember anything about

2     that.  Sustained.

3     Q    (By Mr. Wall)  And I think we just clarified that you

4     indicated the period of time you were in contact with Mr. Kurt.

5     And you identified Ben Bargale (phonetic), a person named

6     Church, and Mr. VanTuyl as the people who actually assaulted

7     you.  Correct?

8     A    Yes.

9     Q    Okay.  Were you -- why were you -- or -- what concerned you

10    about those people?

11    A    They were the ones who assaulted me.

12    Q    Okay.  Were you -- did you ever ask Mr. Kurt about other

13    potential like-minded people?

14    A    No.

15    Q    Okay.  And I think you indicated earlier that you didn't --

16    you indicated that between April and July of 2010, you didn't

17    have any direct contact with Mr. Kurt.  Correct?

18    A    Yeah.

19    Q    Did you testify that you -- it was your belief that if he

20    had information for you, he would contact you during that time?

21    A    Yes.

22          MS. VAN MARTER:  Objection, Your Honor.  Again,

23    leading.

24          THE COURT:  What?

25          MS. VAN MARTER:  He just provided the answer.

1          MR. WALL:  Well, that's all.  Thank you.

2          THE COURT:  Recross, Ms. Van Marter?

3                        RECROSS-EXAMINATION

4    BY MS. VAN MARTER:

5    Q    Sir, since the assault, did you ever see Mr. VanTuyl,

6    Mr. Church, or the other individual -- I always forget his name.

7    What's his name again?

8    A    Ben.

9    Q    Ben.  Did you see any of those individuals again after the

10   assault?

11   A    I seen Ben.

12   Q    At the barbecue?

13   A    Yes.

14   Q    After that, did you see Mr. VanTuyl, Mr. Church, or Mr. --

15   or Ben again?

16   A    Yeah.  I -- I seen Ben at his residence once.

17   Q    And he was the one that you were no longer afraid of.

18   Correct?

19   A    I wasn't worried about him.

20   Q    Okay.  So the two remaining people you were afraid of, you

21   didn't see them again?

22   A    Nope.

23          MS. VAN MARTER:  We renew our objection, Your Honor.

24          THE COURT:  I'm aware that you made an objection to

25   strike testimony on the issue of relevance.  The problem is that

1   during the course of this testimony, there was testimony that

2   could be stricken as not being relevant, but yet it was

3   interspersed with bits and pieces that I felt were relevant; and

4   I trust the jury can sort it out.  Overrule your objection.

5        Thank you, Mr. Johnson.  You may step down.

6        Next witness?

7             MR. WALL:  The defense will call Melonie Howells, Your

8   Honor.

9        (Pause in proceedings.)

10            MR. WALL:  If the defense could have a few minutes.  I

11  believe Ms. Howells was just present.  I don't know if she went

12  to the restroom or something for a moment.  If I could have just

13  a few minutes to try to locate her.

14            THE COURT:  Yeah.  Step out in the hall.  You can't go

15  in the restroom, of course.  But see if she's out there.

16        And in the meantime, let's stand and stretch; and we'll

17  adjourn in about 26 minutes.

18        (Pause in proceedings.)

19            THE COURT:  While they're looking for the next

20  witness, why don't we take about a five- or six-minute break?

21  And if she's not located right away, we may have to adjourn for

22  the day.  But we'll let you know.  So the jury is excused.

23        (Jury out.)

24        (Brief recess.)

25        (Jury in.)

1          THE COURT:  Mr. Wall, have you found your witness?

2          MR. WALL:  Yes.  The defense would call

3     Melonie Howells.

4          THE COURT:  Step forward here, Ms. Howells, and face

5     me and raise your right hand to be sworn, if you would, please.

6     (WITNESS, MELONIE HOWELLS, called as a witness on behalf of the

7     defendant, having first been duly sworn, testified as follows:)

8          THE COURT:  Please be seated.

9                        DIRECT EXAMINATION

10    BY MR. WALL:

11    Q    Ms. Howells, could you state your name; and spell your --

12    both names for the record?

13    A    Melonie Howells.  M-e-l-o-n-i-e H-o-w-e-l-l-s.

14    Q    And where do you reside?

15    A    Spokane, Washington.

16    Q    Okay.  And how long have you resided in Spokane?

17    A    My whole life.  26 years.

18    Q    Okay.  And do you know a person by the name of

19    Anthony Johnson?

20    A    Yes, I do.

21    Q    And how do you know Mr. Johnson?

22    A    I've known Anthony since junior high.

23    Q    Okay.  And did you and Mr. Johnson at some time enter into

24    a dating-type relationship?

25    A    Yes, we have.

1    Q    And do you recall approximately when that was?

2    A    Approximately about three years ago, give or take.

3    Q    Okay.  And how long were you in that dating relationship?

4    A    Almost a full year.  Not quite.

5    Q    Okay.  And during this time, were you aware of

6    Mr. Johnson's involvement in a group called the Vanguard

7    Kindred?

8    A    I was not aware of him involved with a group.  I knew he

9    had a bunch of friends.

10   Q    Okay.

11   A    I didn't know what they were affiliated with or anything

12   along them lines until later.

13   Q    Okay.  Did -- were you aware that he was going to meetings

14   with a group -- particular group of people?

15   A    I was not told -- well, yeah.  He was going over to

16   barbecues and get-togethers.

17   Q    Okay.  And did you ever meet any of the people that he was

18   having these get-togethers with?

19   A    On one occasion, two occasions, I met a few of them that I

20   were told were there.  And one was Wayde, Ben, Keegan, and

21   Church; and they were all present in the car.

22   Q    Okay.  Do you recall an incident in which Mr. Johnson was

23   assaulted?

24   A    Yes, I do.

25   Q    Okay.  And just what your own recollection is, what you

1  know personally happened -- what do you recall?

2  A    I was told -- well, he told me he was --

3  Q    No.  I'm sorry.  Not what he told you --

4  A    Okay.

5  Q    -- but what actually occurred.

6  A    It was my understanding that he was going to a get-together

7  with these friends.  He showed up at my --

8            MS. VAN MARTER:  Your Honor, may I object and voir

9  dire in aid of an --

10           THE COURT:  Ask her if she was there.

11           MS. VAN MARTER:  Yes.

12           MR. WALL:  Okay.

13  Q    (By Mr. Wall)  You -- were you at the meeting?

14  A    No.

15  Q    Okay.

16           THE COURT:  Then how does she know what happened?

17           MR. WALL:  I'm not going to ask her what happened at

18  the meeting, Your Honor.  I'm going to ask her whether or not

19  the --

20           THE COURT:  I thought that she was just about to

21  answer.

22  Q    (By Mr. Wall)  Did Mr. Johnson leave the house to go to a

23  meeting?

24  A    Yeah.  He left and then came back a few hours later.

25  Q    Okay.  And what was his condition when he returned to the

1  house?

2  A    When I opened the door, his face was bloody.  He had no

3  shoes on.  He had marks on his arms and on his hands.  And he

4  looked like he was in an altercation, a fight.  I mean, I opened

5  the door.  That was my first assumption.

6  Q    Okay.

7  A    He got beat up.

8  Q    Okay.  And did you tell him he should do something?  I

9  mean, did you -- did you express concern?

10  A    I wanted him to go to the hospital.  I wanted him to get

11  looked at because I -- I couldn't really do anything for him

12  except for give him some Band-Aids.

13  Q    Okay.  Did he look like he needed more than Band-Aids?

14  A    Oh, yes.

15  Q    And did -- did you have any concerns for your own safety

16  after this incident occurred?

17  A    Yes.

18  Q    Okay.  And why?

19  A    Because he came back and he told me who did it.

20        MS. VAN MARTER:  Objection, Your Honor.  Again, any

21  reference to what other people told her.

22        THE COURT:  Well, that's as background to explain why

23  she was worried for her own safety.  Overruled.

24      Go ahead.

25  A    He just -- he told me that it was some of the people that I

1  had met that were in the car when he had given me a ride to work

2  at -- like before.

3  Q    (By Mr. Wall)   These are the same people that --

4  A    That he --

5  Q    -- you had referenced earlier?

6  A    Yeah.

7  Q    Okay.

8  A    And then he just told me that that had happened to him and

9  what had happened to him.  And he looked like it, so I was a

10 little bit worried because I didn't know them.  I never met

11 them, and I didn't know why they would do something like that.

12 Q    Did you have any understanding at some point that it had

13 something to do with you being partly Jewish?

14 A    It was rumored to be.  I heard a rumor around that fact,

15 but I never said anything along the lines that I was Jewish or

16 that I had for sure Jewish blood in me or however that works.

17 Q    So you didn't have any firsthand knowledge of that?

18 A    No.

19 Q    Okay.  And do you know if Mr. Johnson had met with Mr. Kurt

20 following this assault?

21 A    Who?

22 Q    With Mr. Kurt, Wayde Kurt.

23 A    Oh.  Yes.  He met with him I want to say twice after the

24 altercation.

25 Q    And these were times when you were present?

1  A    I was in the truck.  I was not near the conversation.

2  Q    Okay.

3  A    I was just at the same location.

4  Q    And did you have any understanding as to why Mr. Johnson

5  was meeting with Mr. Kurt?

6  A    To talk about what took place that night and the fact

7  that -- it was my understanding they were trying to figure out

8  what --

9          MS. VAN MARTER:  Your Honor, I'm going to object as to

10  the basis of the knowledge.  She wasn't there during the

11  meeting.

12          THE COURT:  Go ahead.  Ask a foundation question.

13          MR. WALL:  Okay.

14  Q   (By Mr. Wall)  Well, let me ask a different question.  Did

15  you express to Mr. Johnson fear for your own safety following

16  this assault?

17  A    Yes.

18  Q    Okay.  And did that fear continue for a period of time

19  after the assault?

20  A    Yes.

21  Q    And who were the people that you were primarily afraid of?

22  A    Ben, Keegan, and Church.

23          MR. WALL:  That's all I have.  Thank you.

24          THE COURT:  Cross, Ms. Van Marter?

25  //

1                          CROSS-EXAMINATION

2    BY MS. VAN MARTER:

3    Q     Good afternoon, Ms. Howells.

4    A     Hi.

5    Q     So you were with your boyfriend, Mr. Johnson, when he met

6    with Mr. Kurt on two occasion after the assault.  Is that

7    correct?

8    A     Yes.  I believe it's two.

9    Q     And how much time had passed since the assault?

10   A     Maybe a week.  I would say a week between each time that

11   they met and after the assault.

12   Q     Okay.  So maybe the most of a couple weeks after the

13   assault.  Is that correct?

14   A     Yeah.

15   Q     Okay.  And those were the only two meetings that you were

16   present?

17   A     Well, that I recall.  I spent most of my time at work.  So

18   what he did or whom he talked to, I don't know.

19   Q     And during these meetings, you weren't sitting with them

20   while they were talking.  Correct?

21   A     No.  I was in the Blazer with my daughter.

22   Q     Okay.  And you don't have any idea about who the people

23   were involved in the Vanguard Kindred?  You'd never met them or

24   anything like that.  Correct?

25   A     Other than Ben, Keegan, and Church.  And I found out later

1   about the --

2   Q    Are those the only ones that you had met?

3   A    Yes.

4   Q    And you didn't have any association with them?

5   A    Nope.

6   Q    Okay.  And obviously, it's a pretty scary thing to see your

7   boyfriend get beat up.  Fair to say?

8   A    Yes.

9   Q    Okay.  And that has an impact on you.  Right?

10  A    Yeah.

11  Q    Okay.  And have you been -- or -- had you been contacted by

12  law enforcement and asked about what you had been involved in or

13  seen?

14  A    No.  Never really been contacted except for when all of

15  this began.

16  Q    Okay.  And when you were contacted, you were cooperative.

17  Correct?

18  A    Oh.  Yeah.

19        MS. VAN MARTER:  Okay.  I have no other questions,

20  Your Honor.  Thank you.

21        THE COURT:  Redirect?

22        MR. WALL:  No further questions, Your Honor.

23        THE COURT:  Ms. Howells, thank you.  You're excused.

24  Thank you.

25        THE WITNESS:  Thank you.

55

1        (End of requested proceedings.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

56

1                    C E R T I F I C A T E

2

3          I, DEBRA KINNEY CLARK, do hereby certify:

4          That I am an Official Court Reporter for the United

5   States District Court at the Eastern District of Washington;

6          That the foregoing proceedings were taken on the date

7   and at the time and place as shown on the first page hereto; and

8          That the foregoing proceedings are a full, true and

9   accurate transcription of the requested proceedings, duly

10  transcribed by me or under my direction.

11         I do further certify that I am not a relative of,

12  employee of, or counsel for any of said parties, or otherwise

13  interested in the event of said proceedings.

14         DATED this 25th day of January, 2012.

15

16

17

18                              /s/Debra Kinney Clark

19                              Official Court Reporter
                                United States District Court
20                              Eastern District of Washington

21

22

23

24

25