1  Michael C. Ormsby
   United States Attorney
2  Eastern District of Washington
   Earl A. Hicks
3  Stephanie Van Marter
   Assistant United States Attorneys
4  Post Office Box 1494
   Spokane, WA 99210-1494
5  Telephone:  (509) 353-2767

6
                    UNITED STATES DISTRICT COURT
7                   EASTERN DISTRICT OF WASHINGTON

8  UNITED STATES OF AMERICA,          )
9                  Plaintiff,          )        2:10 CR-00114-001-WFN
                                       )        2:11 CR-00161-001-WFN
10         vs.                         )
                                       )        United States Sentencing
11 WAYDE LYNN KURT,                    )        Memorandum
                                       )
12                 Defendant.          )

13
14         Plaintiff, United States of America, by and through Michael C. Ormsby,

15 United States Attorney for the Eastern District of Washington, and Earl  A. Hicks

16 and Stephanie Van Marter, Assistant United States Attorneys  for the Eastern

17 District of Washington,  respectfully submit the following Sentencing

18 Memorandum.

19         The United States has reviewed the  Presentence Report  (hereinafter PSI )

20 prepared  by United States Probation Officer Gloria M. Petrette (hereinafter USPO

21 Petrette) on March 29, 2012 and filed a Notice of Review of  Presentence Report

22 on April 12, 2012.  The United States has also reviewed the transcript of the trial

23 testimony of the Defendant Wayde Lynn Kurt, Anthony Johnson and Melanie

24 Howells. The United States has also reviewed the exhibits admitted at trial,

25 discovery provided to the Defendant, prior reports of the United States Secret

26 Service (hereinafter USSS), the Federal Bureau of Investigation (hereinafter FBI)

27 and other law enforcement agencies, and documents submitted by the Defendant.

28

United States Sentencing Memorandum - 1
P20427LH.EHA.wpd

Moreover, based upon this review, the United States has attached a number of Exhibits (hereinafter referred as Attachments A through E) for the purpose of establishing the Defendant's history of criminal conduct.  This history is relevant as it establishes not only that his criminal conduct has been ongoing even while under supervision by this Court and others, but to also establish the extent of his involvement in an overall criminal objective to commit a terrorist act.  These attachments will also aid the Court in understanding the extent of the Defendant's intent to obstruct law enforcement and the extent of his false testimony and fabricated defense.

Based upon this review and the plea agreement filed in cause # 2:11 CR-00161-001-WFN filed on February 8, 2012 the United States is recommending to this Court that it sentence the Defendant to a term of  incarceration of 11 years. The United States submits that based upon the advisory sentencing guidelines and/or the sentencing factors outlined under 18 U.S.C. § 3553(a) and (b), that an 11 year term of imprisonment is an appropriate sentence.

## I.    Base Offense Level for Felon in Possession of Firearms

The United States submits that pursuant to the advisory Sentencing Guidelines, the Base Offense Level for Felon in Possession of Firearms in this case (Count 1 2:10 CR-00114-001-WFN), is 20 as was also recommended within the PSI . See, ¶ 55 PSI dated March 29, 2012.  This base offense level is accurate because the offense involved the Defendant's possession of a semi-automatic firearm that is capable  of accepting a large capacity magazine.

The Defendant has filed an objection  to this finding alleging there is no evidence that at the time of the offense, any of the firearms had a large capacity magazine attached or in close proximity to a semiautomatic firearm.  See Defendants' Objections to Presentence Investigation Report (hereinafter Defendant's Objections)at  pg  4. To the contrary, the United States submits that

United States Sentencing Memorandum - 2
P20427LH.EHA.wpd

the evidence presented at the Defendant's trial and concluded through verdict form by the jury, was that the Defendant was in possession of such a weapon.

Specifically, the evidence presented to the jury was that on August 21, 2010, the Defendant and the CI traveled to the CI's property for the purpose of target practicing. Prior to arriving, the Defendant and the CI met where the CI transferred 3 of his firearms to the Defendant's vehicle. The Defendant was also aware of these firearms and had previously asked to be able to shoot them in a recorded conversations. The Defendant brought two of his firearms and drove them out to the CI's property to target shoot.  As the Court is aware, the target practice was audio and video taped wherein it displayed the Defendant shooting and in possession of all 5 firearms, including the semi-automatic firearm, a firearm that the Defendant expressed specific interest in because of it high capacity ability. After the target practice was over, the CI maintained possession of his 3 firearms expecting that there would be additional target practice at a later date.  The Defendant  was subsequently arrested prior to there being a second target paractice.

As testified to at trial and what will again be testimony at sentencing by SA Cleary, is that SA Cleary seized the CI's 3 firearms that were used at the target practice on August 21, 2010. These same 3 firearms used  by the Defendant were also admitted into evidence.  Since that time, these weapons have been in the possession of the Bureau of Alcohol Tobacco and Firearms, including the ammunition clips used during the target shoot and seen on the video.  Recently, SA Daryl Bone of ATF loaded two of the ammunition magazines for these weapons used by the Defendant and concluded based upon his training and expertise, that each magazine was for a separate weapon  belonging to the CI and that both of  the magazines were capable  of holding 30 rounds of ammunition. In addition Special Agent Cleary  is expected to testify that he recently confirmed that the CI only had one ammunition magazine for each of the semi-automatic

firearms which the Defendant used on August 21, 2010. The CI further advised Special Agent Cleary that he had no other magazines for the 2 semiautomatic firearms and that the magazines in the possession of ATF and displayed on the video, were the same.

The United States was not required during trial, to present evidence as to the capacity of each magazine as that fact was not relevant to the elements before the jury.  Therefore, the Defendant erroneously suggests that there is no evidence to support this offense level.  The evidence which showed the Defendant's use and possession of such a weapon and magazine was admitted, the fact that those magazines had the capacity to hold 30 rounds of ammunition each is relevant and appropriate to consider for sentencing. Thus, ¶ 36 of the PSI accurately reports the information and accurately concludes the base offense level to be 20.

## II.     § 3C1.1 Obstruction of Justice Adjustment

The United States again concurs with the PSI's application of the obstruction of justice enhancement based upon a number of facts before the Court. In addition to the reason set forth by USPO Petrette in the PSI, the United States believes it is also applicable based upon the Defendants false testimony during trial.  As this Court concluded in denying Defendant's motion for an entrapment instruction, the Defendant's testimony was simply not credible.  The United States submits that the Defendant' s defense was based a concocted and fanciful story. On both those grounds, the Court should conclude the enhancement is appropriately applied.

### A.     Threatening, Intimidating or Otherwise Unlawful Influence of a Witness:

The PSI appropriately assigned two levels based upon the Defendant threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly or attempting to do so.  This enhancement is based the Defendant's letter admitted as Gov. Exhibit 51.  As the Court is aware, a

United States Sentencing Memorandum - 4
P20427LH.EHA.wpd

CI was utilized during the course of this investigation to both tape record and keep in contact with the Defendant in order to try to find out what the Defendant was up to involving possible criminal conduct.  This CI testified at the Defendant's trial which began on October 17, 2011.  On or about March 18, 2011, a letter authored by the Defendant, was intercepted at the Spokane County jail. One of the purposes of the letter was to contact Harold Covington, Keegan Van Tuyl and Lynn Crawford  to advise them of the name of the CI.

Aside from this letter being yet another example as to why the Defendant's testimony was untruthful, this letter also clearly established that when the Defendant sent this letter, he was attempting to intimidate or interfere with the CI's testimony.  The Defendant knew at the time he sent this letter, that Keegan Van Tuyl was a member of the VK and also the VBS and had previously been involved in assaultive conduct both towards people associated with his organization and nonwhite individuals. The Defendant clearly knew that Harold Covington belonged to a White separatist organization that advocated a race war so that he and the members of the Northwest Front could have a separate White nation. The Defendant also admitted during his testimony that Covington's book (*The Brigade*) promotes violence. See, Def. Trans. at pg. 192-193. The Defendant also knew at the time that Lynn Crawford had discussed with him nuclear weapons and killing the President of the United States.

The Defendant testified at trial that he told numerous other people who the CI was so that everyone would know who the CI thus exposing him to risk but also for the purpose of obstructing the Government's case. See, Def. Tren sp. at pg. 172-173 and 181-183. The Defendant claimed he did not do it to retaliate See, Def. Tren sp. at pg. 173, however, by the Defendant's own words, "A true patriot will immediately expose the C.I. and try to derail the government agenda at every turn as I have done." See, Gov. Ex. 51.

United States Sentencing Memorandum - 5
P20427LH.EHA.wpd

The United States submits that the Defendant knew that by exposing information about the CI to people within the White separatist/ supremacy movement and other criminals, that someone would likely retaliate against the CI or attempt to influence or prevent the testimony of the CI. The Defendant knows based upon his long criminal history and long periods of incarceration, that providing information about a CI can interfere with the testimony of a CI based upon threats by others.  Moreover, the Defendant expressed a number of times during his recorded conversations as well as the additional materials submitted to the Court, his disdain for government informants.  See, Attachment A through E. Specifically, during a tape recorded conversation the Defendant indicated to the CI that he was going to retaliate against people who had previously ratted him off and interfered with his plans. See, Attachment E at 201-203.

The Defendant in his own words noted in Government Ex. 51, and while incarcerated, continued with his intention to "thwart" the Government at every turn.  He passed on the identity of a CI to known violent white supremecists for not other purpose that an attempt to interfere with his potential testimony.  There is no question that USPO Petrette has appropriately added these 2 additional points based upon the Defendant's attempted obstruction of justice.

**B.    False Testimony**:

The 9th Circuit's test to determine whether a § 3C1.1 adjustment for perjury should be given is as follows:

> "For a court to find that a defendant obstructed justice through perjury, it must find that (1) the defendant gave false testimony, (2) on a material matter, (3) with willful intent." *United States v. Garro*, 517 F.3d 1163, 1171 (9th Cir. 2008).

In *United States v. Harrison*, 585 F.3d 1155, 1161 (9th Cir. 2009) (emphasis added), a case citing *Garro* and upholding the § 3C1.1 enhancement, the Court used the following language to describe the defendant's testimony, ". . . after

1  observing [the defendant's] demeanor, the district court concluded that he

2  '*concocted a fanciful story, and then in order to cover one lie, lied again and then*

3  *lied again.*'"

4      The United States respectfully submits that the Defendant "concocted a

5  fanciful story."  The United States reviewed the trial testimony of the Defendant,

6  the trial exhibits and other documents outlining his conduct while he was involved

7  with the Vanguard Kindred (VK).  The United States has also included a number

8  of attachments that will be more fully discussed below, which are also important

9  in highlighting that the Defendant's testimony was not truthful.

10      The Defendant's testimony under oath in support of his defense, centered

11  around a number of statements to include the following: That the Defendant was

12  only involved with the VK for religious reasons and not to support white

13  supremacy; that the Defendant was only pretending when he discussed  terrorist

14  acts and white supremacist beliefs in his letters to the CI and during his tape

15  recorded conversations with the CI; and that the only reason he remained in

16  contact with the CI was to determine whether there was any further risk of harm to

17  Anthony Johnson or his girlfriend after Johnson  was beaten by members of the

18  VK and Valhalla Bound Skinheads (VBS).

19      The United States submits that the Defendant's entire defense and testimony

20  was predicated upon false information as was displayed through a number of

21  exhibits admitted during trial to include the video tape of the Defendant's

22  expressed intentions over the last 20 years.  Specifically, the United States submits

23  the Defendant did not associate with the VK just for religious reasons but to

24  further his overall criminal objectives and intent. See, Attachments A through E.

25  The United States has maintained that the Odonist religion is sometimes a front

26  used by white supremacists to legitimize their meetings and activities. The

27  Defendant himself acknowledged this during his testimony. See, Def. Trans. at

28  134. During tape recorded conversations between Keegan Van Tuyl and the CI,

United States Sentencing Memorandum - 7
P20427LH.EHA.wpd

1  the issue of making their activities look legitimate was also discussed.  See,

2  Attachment D at pgs. 100-200.

3        Moreover, it is clear that the day that Anthony Johnson was assaulted, they

4  were not present for a religious meeting. Johnson testified that the meeting where

5  he was assaulted was  not an Odonist religious meeting, yet all were present to

6  include the Defendant.[1] See, Johnson Trans. at 15-16 and Def. Trans. at 20-21.

7  Johnson further testified he was assaulted for wearing red shoe laces which

8  significant only to the white supremecist movement, not the Odonist religion. See,

9  Johnson Trans. at 16-17. During his testimony, the Defendant  stated that he knew

10 there were skinheads who were associating with the VK and whom he knew. See,

11 Def. Trans. at 15. The Defendant also testified that during meetings,  people

12 expressed white supremacist beliefs and that there were discussions of taking

13 action against the races, yet the Defendant tried to convince the jury he was only

14 there to "educate" them about his religion. See, Def. Trans at 18-20.

15       During cross-examination, the United States confronted the Defendant with

16 Government's Exhibit number 50.  Exhibit 50 is a videotape  of a VK meeting

17 attended by the Defendant and others on January 10, 2009, before the assault on

18 Anthony Johnson and before his involvement with the CI.  See, Def. Trans. at

19 122. The Defendant testified that he was aware that he was being videotaped by a

20 VK member, but did not know that it was in the hands of the FBI and certainly did

21 not know we had to play for the jury.  See, Def. Trans. at 126-127. The portion of

22 the videotape which was admitted into evidence shows the Defendant answering

23 the question  of what have you done for your race recently. There were no

24 questions about his religion. The Defendant stated he had been working toward a

25

26       [1]It is also important to note that the Defendant testified that the CI
   participated in the assault against Johnson.  See, Def. Trans at 24. This too was
27 false as exemplified by Johnson's testimony who stated that the CI did NOT
   identify the CI as assaulting him.  He further testified that he was with the CI
28 about a week later and was not afraid of the CI.

United States Sentencing Memorandum - 8
P20427LH.EHA.wpd

"final solution" everyday for the last 20 years.  See, Def. Trans. at 125. The Defendant admitted the videotape was accurate and was supposedly done during an Odonist meeting. See, Def. Trans at 124. The Defendant further admitted that the "final solution"  he was talking about, was the problem with the races and is not part of the Asatru religion.  See, Def. Trans. at 125, 128.

In addition to Exhibit 50, the recorded conversations with the CI, before the Defendant knew it was a CI, were replete with racial epitaphs indicative of the Defendant's true criminal objective.  See, Gov. Trial Exhibits and Attachment E. Perhaps more insightful than those tapes, is the fact that this theme is constant and continuous in the Defendant's extensive criminal history.  See, Attachments A through D. During the Defendant's lengthy history of criminal conduct, he has developed certain specialties. The specialties include the manufacture of counterfeit currency, the manufacture of false identification and the ability to modify weapons. The United States submits that the evidence shows that the Defendant was offering these specialty skills to the VK and VBS who were involved in typical White supremacist missions and ideology. This act of soliciting these special skills to other members of white supremecist movements or other individuals engaged in criminal activity, is also common theme throughout the Defendant's history. See, Attachments A though D. Additionally, the Defendant testified as to how proud he was of these skills, his ability to counterfeit identification, currency and social security cards.  See, Def Trans. at 147.  As discussed again below, the Defendant testified that he only produced these identification to obtain library cards or post office boxes.  See, Def Tran at 142-145.  That was clearly a false statement under oath because during the recorded conversation and related to his second Indictment, the Defendant stated the following:

> Maybe I should leave my phone number for her boyfriend.  See if he
> wants to join a militia group.... Get it to her boyfriend.  Send my

secret number....Use my Hubert name and that phone number.  Hubert address.  maybe that's what I should do, post office box address."
See, Attachment E, at 171-172.

Additional examples supporting the conclusion that the Defendant's defense and testimony were false, are the following.  The Defendant testified at trial that what he said on tape was "... just as Mr. Udseth was pretending with Mr. Kurt, Mr. Kurt was also pretending." See, Def Trans. at 70.  The Defendant denied intending to commit any acts of terrorism or acts that would assist white supremacist beliefs. The Defendant further claimed that he was trying to weave a story in order to better protect Anthony Johnson  and his girlfriend from unknown skinheads who the CI was in contact with.  However, as testified to by Johnson and Ms. Howell, Mr. Johnson had not seen or spoke to the Defendant in over a year.  See, Anthony's Trans. at 7-9.  Ms. Howell testified that she had seen the Defendant on two occasions about a week or two after the assault and had not seen him since that time.  See, Howell Trans. at 45-48.  Perhaps the most unbelievable being the testimony from the Defendant trying to explain why it is he did not help Mr. Johnson after being assaulted.  See, Def. Trans. at 167-169.

As this Court concluded, the Defendant's defense and testimony simply was not believable specifically noting his alleged justifications for meeting with the CI. The Defendant further attributed his statements about terrorism as having come from the books  "The Brigade" and "The Turner Diaries."  Both books are popular amongst those involved in the White Supremecist and anti-government movements which even if he had been quoting, are more consistent with his overall criminal objective than this alleged "spy" game.  The Defendant further claimed that the only reason he possessed the firearms was to impress the CI because the Defendant claims he was asked to be an armorer  for him.  See, Def. Trans. at pg. 59; 163.  Yet, nowhere in the taped conversation is there any discussion between the Defendant and CI about Mr. Kurt being an armorer.

United States Sentencing Memorandum - 10
P20427LH.EHA.wpd

The United States submits that this is again an example of the fanciful story created by the Defendant in light of the overwhelming evidence against him regarding the planning and preparation of a terrorist act which would potentially harm the President of the United States and/or property and persons of the United States, as the Defendant wanted, similar to the Oklahoma City bombing.  In fact, it is was the Defendant in the tape recorded conversations who repeatedly raised his own expertise in manufacturing firearms, ammunition, and parts, all of which was done in attempt to have the best weapon, the most effective weapon and the most silent weapon for an attack.  As the Court concluded, none of that had any relationship whatsoever to his manufactured defense regarding Mr. Johnson.

The Defendant testified for almost 8 hours.  In light of the taped conversations and the additional materials submitted here, there can be no other conclusion than the Defendant's entire defense and testimony was predicated on a fanciful story.  Therefore, there is more than enough in the record to support such an enhancement.

## III.    § 3A1.4 Terrorism Adjustment

The 9th Circuit has only nine cases that cite § 3A1.4. None of the cases have as thorough of an analysis of the guideline as the 2nd Circuit does in *United States v. Awan*, 607 F.3d 306, 313-317 (2d Cir. 2010). In *Awan*, the court indicated,

> According to the ordinary meaning of § 3A1.4, then, an offense is "intended to promote" a federal crime of terrorism when the offense *is intended to help bring about, encourage, or contribute* to a federal crime of terrorism as that term is defined in 18 U.S.C. § 2332b(g)(5). See Stewart, 590 F.3d at 137 ("The criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B).' " (alteration in original) (quoting Mandhai, 375 F.3d at 1248)); Arnaout, 431 F.3d at 1002("[T]he word 'promote,' as used in § 3A1.4, signifies that where a defendant's offense or relevant conduct helps or encourages a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)(B), then § 3A1.4 is triggered.").
> *Awan*, 607 F.3d at 314. (emphasis added).

United States Sentencing Memorandum - 11
P20427LH.EHA.wpd

The case with the most extensive discussion of the enhancement in the 9th Circuit is *United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008). There the court said,

> In reviewing the legislative history of § 3A1.4, two things are clear, (1) Congress wanted to limit the application of the terrorism enhancement to only those crimes that involved or intended to promote a crime enumerated in § 2332b(g)(5)(B), and (2) Congress wanted to include an element of intent.
> *Tankersley*, 537 F.3d at 1113.

Amongst those listed statutes, there are several that apply here. First, 18 U.S.C. § 1751, prohibits the assassination or attempted assassination of the President.  Another is 18 U.S. C. § 2332a, which prohibits the use or *threatened* use of a weapon of mass destruction. A weapon of mass destruction is any destructive device defined in 18 U.S.C.§ 921. See 18 U.S.C. § 2332a(c)(2)(A). Section 921(a)(4)(A) defines destructive device to include any explosive or incendiary device such as a bomb or other similar device.

The first question for the Court then is, whether the Defendant's experimenting and manufacturing multiple types of sub-sonic ammunition, recruitment of the CI, purchase of firearms and ammunition by the Defendant, the target shooting of some of the experimental rounds, rounds which would not leave any trace evidence, the purchase of an ammunition reloader so he could make untraceable ammunition, and the recorded statements  made to the CI during their meetings, was intended to help bring about, encourage, or contribute to a plot to assassinate the President of the United States.  The next question is whether or not the same circumstances outlined above were intended to encourage the destruction or threat to destroy involving any person or property in the United States  by using the mail in furtherance of the offense or involved any property owned or leased by the United States or agency of the United States or of  any property used or affecting interstate commerce.

As the court is aware, the parties agreed to certain redactions of the conversations between the Defendant and the CI. As a result, the entire tapes were not played for the jury. They are now relevant to support these enhancements. Those additional sections have been provided as Attachment E. What is clear on looking at the totality of these conversations, those admitted to jury and now presented in Attachment E, is that the Defendant had a plan to support the final solution against the United States. In addition to the tape recorded conversations, the United States has attached several other exhibits which further support this position. The United States would submit this has been his overall criminal objective for the last twenty years. Specific examples are as follows.

The Alfred Murrah Building, a federal building in Oklahoma City, Oklahoma, was bombed in an act of domestic terrorism on April 19, 1995. During a recorded conversation with the CI on August 21, 2010, the Defendant discussed a plan that he had but that he would talk about it with the CI after the "yuletide." See, Gov. Ex 3B, at 36. The Defendant indicated that he was putting his finances together. See, Gov. Ex 3B, at 36. The Defendant then stated that he did not want any innocent people to die from it but it was a possibility that there would be collateral damage. See, Gov. Ex. 3B at 36-37. The Defendant told the CI that this would be an act of terrorism of the worst kind and that if they were caught they would get the death penalty. The Defendant then likened his act of terrorism to the Alfred Murrah building. See, Gov. Ex. 3B at 36-37.

The United States submits that this alone constitutes a threat against a federal building by the use of an explosive and that the Defendant was in the process of planning this act and encouraging the CI to participate. Evidence presented at trial put this threat in perspective. The Defendant was meeting with a person who he believed was a violent skinhead who was associated with a white separatist group that advocated a White homeland in the northwest. The Defendant was not aware that the CI was working for the FBI at the time he made the

United States Sentencing Memorandum - 13
P20427LH.EHA.wpd

statements.  The Defendant, prior to this time, had already purchased an ammunition reloader and manufactured subsonic ammunition so that he could do a silent kill. The Defendant was attracted to the CI because he could lawfully possess firearms and had land that the Defendant could test out his weaponry without drawing attention. As previously highlighted, during the January of 2009 videotape, the Defendant stated he working for 20 years on the final solution. This will be a common theme as the Court reviews the Defendant's history.  Even the Defendant testified that his opposition was the United States Government.  See. Def. Trans. at 159-160.

Moreover, during recorded conversations, the Defendant discussed putting together a paramilitary organization, working with existing paramilitary organizations, in order to further his white separatist or supremacy  beliefs. The Defendant, in formerly redacted sections, goes on to discuss the involvement of radical groups in his plan, the development on an office for recruitment of members and the need to finance their operations.  See, Gov. Ext 6b and Attachment E, August 30, 2012.

In regards to the threat to the President, it too must be read in context.  On August 12, 2010, the Defendant said the President needed to be killed.  See, Gov. Ex. 2b, pg. 81-82 and Attachment E, same pages.  The Defendant also discussed with the CI his friend Lynn Crawford.  The Defendant indicated that Crawford had violated his security measures regarding the phone.  The Defendant stated that this violation could result in them going to prison for the rest of their lives because they were discussing theft of nuclear materials and killing the President of the United States.  See, Gov. Ex. 2b, pg. 81-82 and Attachment E, same pages.  This also clearly shows a plan and the encouragement of another to assassinate the President of the United States.

The Defendant further discussed his frustration and desperation:

United States Sentencing Memorandum - 14
P20427LH.EHA.wpd

1

> And we've got it you know I'm not going to stand by and just let it
> go on.  Maybe its just desperation of an old man thats figured he's
> gone too far spent too many years in prison, hell you know I've done
> almost twenty years in federal prison.  Real close to twenty years.
> Eighteen and half years and always on parole, in like three three
> segments of being in prison, out on parole, back in.  Never once
> giving up, and always for the right reason not for criminal acts.  For
> fighting against the government for our white race every time.

Attachment E, August 21, 2010, pg 201-202.

The Defendant further stated that this was his fourth time around and that he

was going to "do it."  See, Attachment E, August 21, 2010, at 203-204. The

Defendant explained that he never got off the ground because he was always ratted

off, but this time was going to be different. *Id.*  The Defendant stated that the

white people he was working with would get greedy get caught and ratted him off.

However, for the Defendant, it was about a greater criminal objective,

> And I made it very clear to 'em that this is all for political purposes,
> this money is going toward our race, re-establishing ourselves....
> So,  I'm going to take care of some shit next year and then I'm going
> to go take care of all the rats.  They haven't been visited by me yet.
> They've got to answer for what they've done... But business first, take
> care of business.  Got to stop Barry Soetoro (***Referring to the***
> ***President)*** from being re-elected ...absolutely.

See, Attachment E, August 21, 2010 at 203.

The United States respectfully submits that there is clear evidence from his

own statements, in combination with his history which will be more fully

discussed below, that the Defendant had every intention of committing a terrorist

act if his plans were not discovered.  This is an act and criminal intention the

Defendant has attempted to accomplish over twenty years, each time being

thwarted for one reason or another.  The United States submits that but for the

intervention of law enforcement, the Defendant would have continued to carry on

his criminal objective.  Although the United States does not know what the

specifics of his plan were but believes the evidence supports the conclusion that it

was intended to be a terrorist act against the Government to include ensuring that

United States Sentencing Memorandum - 15
P20427LH.EHA.wpd

President Obama would not be reelected.  Thus, the United States submits this enhancement is likewise appropriately applied.

**IV.    In application of the 18 U.S.C. 3553(a) Factors, the Proposed Sentence is Reasonable.**

The United States submits that if this Court does not agree with the above adjustments being applied in this case, that the Court should upward depart when considering 18 U.S.C.§ 3553 sentencing factors.  The United States respectfully submits that the Defendnat is a career offender who has displayed no intention to ever stop his criminal behavior.  A stated, the evidence should leave this Court with no other conclusion than the Defendant is a very dangerous offender whose sole motivation for the last twenty years has been acts leading to or for the purposes of planning violence against the United States.  The United States further submits that the recommended sentence also provides adequate deterrence to criminal conduct involving threats against the President and threatened  acts of terrorism.

The Court must now consider not only the applicable advisory guidelines, but the factors as set forth in 18 U.S.C. § 3553.  18 U.S.C. § 3553 states, in relevant part, that:

> the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and

United States Sentencing Memorandum - 16
P20427LH.EHA.wpd

1    (D) to provide the defendant with needed education or vocational
2    training, medical care, or other correctional treatment in the most
     effective manner.

3    18 U.S.C. § 3553(a)(1) and (2).

         A.    Application of the Factors:

4         In this case, the nature of the offense and history of the Defendant, establish

5    that he has been involved in criminal activity for most of his adult life.  What is

6    unique, is that this criminal activity has been tied to an overall criminal objective

7    that he has not and will not abandon, no matter the number of times he is arrested

8    or sent to prison. The United States has attached a number of items relative to the

9    Defendant's history and characteristics, as well as relevant for consideration of the

10   Defendant's fabricated defense.  The United States will address them by category.

11                        **Reports of Law Enforcement**

12        The United States is submitting reports from various law enforcement

13   agencies for this Court's consideration in determining whether or not the

14   Defendant testified falsely during trial and also for the purpose of showing the

15   history and characteristics of the Defendant.  See, Attachment A through C.  These

16   reports also establish the Defendant's recidivist behavior as a majority of these

17   investigation involved criminal conduct of the Defendant while he was under

18   Court supervision, much like occurred here.

19        In one of the attached reports, a report dated June 15, 2004, and a

20   supplement to that report dated February 12, 2007,  SA John Neirinckx of the

21   United States Secret Service (hereinafter USSS) provides a good outline and

22   summary as to the Defendant's history as it relates to  prior investigations

23   involving the following:  (1) the manufacture and possession of counterfeit

24   currency; (2) the making of false identification; (3) the Defendant's  possession of

25   a stolen United States military computer; and (4) the theft of tracking device

26   belonging to the USSS.  The United States is asking this Court to review these

27

28

United States Sentencing Memorandum - 17
P20427LH.EHA.wpd

report as it believes they will assist the Court at the time of sentencing.  Following are some highlights of the report:

1.     The  USSS first became aware of the Defendant using false identification on June 6, 1986, when the Defendant was arrested  for passing counterfeit currency.  At that time of his arrest, the Defendant identified himself as Thomas Rushton and was in possession of a counterfeit Washington State drivers license with the Defendant's photo and the signature of Thomas Rushton.  The Defendant also possessed a counterfeit social security card in the name of Thomas Rushton.  During the Defendant's testimony, he was quite proud of his ability to counterfeit currency and identification.  He estimated he had produced hundreds over the years.  See, Def. Trans. at 141-147.  A separate CI along with other individuals, informed the USSS  that the Defendant had offered to sell counterfeit Washington State identifications and drivers licenses to them.  The Defendant was reported to have indicated that he would sell a Washington State drivers license for $100 if it had security features and for $60 if it did not.  The United States further submits that this is significant because the Defendant during his testimony, stated that he only used counterfeit Washington State drivers licenses and counterfeit social security cards to open mail boxes and get library card.  See, Def. Trans. 142-145.  This again clearly shows that Defendant perjured himself during trial but also a common theme of developing his criminally motivated skills.

2.     During the 2004 counterfeit investigation of the Defendant, the USSS seized approximately 23 counterfeit social security cards where the numbers were issued to other individuals than the names shown.  Also located during the investigation was a social security card with the actual number assigned to Herbert C. Jarvis, who had died on January 6, 2002.  Numerous items used to manufacture counterfeit identification were found during the searches.  These included printers, computers, laminators, special  paper, special ink's, and plates that could be used for transferring images.  Also located were numerous counterfeit seals for sheets

United States Sentencing Memorandum - 18
P20427LH.EHA.wpd

1  of paper bearing the color shifting images of "Washington" simulating security

2  features found on Washington State drivers licenses, a half ton Arbor  press loaded

3  with a counterfeit county recorder's office seal which matched the embossed seal

4  on counterfeit birth certificates that were located and numerous other items.   24

5  counterfeit Washington states drivers licenses were seized from the Defendant's

6  van with numerous names bearing the photograph of the Defendant.

7        (a.)    One of the false identifications was in the name of Samuel Roth

8  Yoder, a real person  The investigation revealed  that the Defendant also had a

9  false social security card in this name obtained partially through the use of

10  counterfeit school records and a counterfeit birth certificate in Yoders  name.  It

11  was further revealed that the Defendant had completed a postal change of address

12  in Yoders name and sent it to a post office in Rockford, Illinois.  The apparent

13  purpose was to reroute Mr. Yoder's mail to the fraudulent box set up by the

14  Defendant to assist in his identity theft. The Defendant also used this false

15  identification in Yoder's name, to create an entire new set of dental records.  The

16  result of this being that should his teeth ever be identified, it would be tied to

17  Samuel Yoder, not the Defendant.

18        (b.)    False identification in the name of Jesse Dean Vessey  which

19  the  Defendant used to open a post office box,  to register a motor home and to

20  rent storage units where he hid evidence of his crimes.  It should be noted that the

21  Defendant  was on supervised release in federal court  at the time of this

22  investigation.

23      3.      During the investigation regarding the Defendant counterfeiting

24  currency again, which resulted in a charge for Theft of Government property, a CI

25  reported that the Defendant was stealing large amounts of documents from

26  Goodwill which were contained in the donated items of customers.  At the time of

27  his arrest in that case, the Defendant had in his wallet identification for a Deputy

28  Clerk, of the Federal Bankruptcy Court.  This individual was contacted  and stated

United States Sentencing Memorandum - 19
P20427LH.EHA.wpd

that the identification was probably left with some personal belongings that were donated by this individual to the Goodwill Industries Attended a Donation Center. This individual positively identified the Defendant as the person receiving the donation and indicated that the Defendant did not have permission to possess this individuals identification document.

       (a.)    During that same case, the Defendant made threats to blow up Spokane because he was upset over the USSS placing a tracking device on his vehicle.

### Prior letters written by the Defendant

During the course of numerous investigations involving the Defendant the USSS  has obtained letters which were written by the Defendant. The United States obtained these letters after reviewing the  official files of the Spokane Resident Office of the USSS relating to the Defendant. The United States believes that these letters are appropriate for the Court's consideration for a number of reasons.  First, these letters are relevant under the provisions of 18 U.S.C. § 3553(a) as they are the Defendant's own words helpful in understanding the true history and characteristics of the Defendant.  Second, these letters also show  the significant need to protect the public from further crimes by this Defendant. Third, they further prove that he intentionally made materially false statements during his trial testimony.  Fourth, they show that the Defendant has previously engaged in conduct involving intimidation of witnesses against him and other obstructive conduct.  Lastly and perhaps most importantly, these letters again highlight the Defendant's overall criminal objective as they are again replete with discussion involving white supremecy, gathering funds to support his movement, the use of false identifications, taking over computer data bases and general anti-government statements aimed towards terroristic acts against the Government. For purposes of this sentencing memorandum the United States will give a brief summary of some of the letters.

United States Sentencing Memorandum - 20
P20427LH.EHA.wpd

1.      Letter from the Defendant to Dean Ashworth dated March 11, 1997: This letter appears to be written by the Defendant while he was in federal custody in Texarkana, Texas. The letter is signed " Your brother at Arms" followed by the initials "WK" the same way he signed some letters in this case.  The Defendant used the name of another inmate at the FCI in Texarkana, Texas for a return address.  This is again exactly the same type of procedure he followed when he sent Gov. Ex. 51.  In this letter, the Defendant indicated that he used a false name and drivers license at the time he was arrested.  He further discussed the possibility of "Lonny"  cooperating with the feds and that she needed some encouragement to "hold out" during questioning without giving up.  He further stated that he was concerned that someone might say that they saw him with weapons.

2.      Letter from the Defendant to "Dean" from the Defendant dated 11-16-96.  This letter is regarding the same prosecution and includes statements by the Defendant about passing of different qualities of counterfeit; the Defendant being upset with his sister (for cooperating with law enforcement) and stated she needed to be taught a lesson; the Defendant noted that he was going to get revenge against someone who he was concerned would go right to the Feds if he felt his life was threatened; discussed that he has lost his computer files and is concerned about more charges and jail time if this person turned this information over to the feds.

3.      Letter to "Mac" from the Defendant signed "your brother at Arms" followed by the signature of Wade L. Kurt on 1/1/1996.  This letter was an example of the Defendant soliciting his skills in counterfeiting for his anti-government objective which was to break into law enforcement databases like NCIC.  The Defendant stated that he had sent samples to the aforementioned "Dean" who did not want to finance any of his operations.  The Defendant then bragged that he sent his Washington Driver's licenses down to his people on the run and his cards were working fine in California, thus concluding that their false

identification worked to conceal their real identity.  The Defendant stated he had shown his samples to other white separatists who want 2 million in counterfeit product.  The Defendant then stated he had an offer for his counterfeit currency by Jews but stated he would make a deal with the devil but not the Jews.  Most importantly as an insight into the Defendant's historical plan, he stated:

> I also have an Extreme Political objective and that is why I work day and night like a driven man......I don't care how many people I beat to death to get the information I need, including any and all telephone company personnel.  So if you are going to be connected with me be fore warned I will not stop at blood.  I get my hands on 15 million in gold bullion and their nightmare begins

See, Attachment B, letter dated 1/1/96 at 5.

## Conclusion

The United States respectfully submits that eleven years is more than warranted given the Defendant's conduct in this case which includes his efforts to obstruct justice and his false and fanciful testimony.  The Defendant's history and characteristics further support this recommendation as it is clear from the Defendant's criminal history and his own oaths of affirmation, that he has had an overall criminal objective he has been working toward for over twenty years.

DATED this 27th day of April, 2012.

Michael C. Ormsby
United States Attorney


s/Earl A. Hicks

Earl A. Hicks
Assistant United States Attorney

United States Sentencing Memorandum - 22
P20427LH.EHA.wpd

I hereby certify that on April 27, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following, and/or I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participant(s):

Richard D. Wall
221 West Main, Suite 200
Spokane, WA 99201

Gloria M. Petrette
U. S. Probation Office
920 West Riverside, Room 540
Spokane, WA 99201

s/Earl A. Hicks

Earl A. Hicks
Assistant United States Attorney

United States Sentencing Memorandum - 23
P20427LH.EHA.wpd